IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel*. BRIAN WALL, | ) | |
| | ) | |
| Plaintiff, | ) | No. 3-07-0091 |
| | ) | JUDGE HAYNES |
| v. | ) | |
| | ) | |
| CIRCLE C CONSTRUCTION, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF UNITED STATES' MOTION FOR SUMMARY JUDGMENT

**I.      INTRODUCTION**

All of the evidence shows that Circle C Construction, LLC (Circle C) knowingly submitted

false payroll certifications to the Department of the Army in violation of its contractual agreement

to abide by the Davis-Bacon Act requirements.  As such, Circle C has violated the false statements

provision of the False Claims Act (FCA), been unjustly enriched and received payment by mistake,

and there is no genuine issue of material fact remaining for trial.  All the evidence also shows that

Fort Campbell's damages amount to $553,807,71.  As explained in the statement of material facts

and argument sections below, summary judgment on both liability and damages should therefore be

granted.

**II.      UNDISPUTED MATERIAL FACTS**

During the relevant period for this case, Circle C was a contractor that had a contract (the

contract) to construct buildings at Fort Campbell.  See Statement of Facts, ¶¶ 1 & 9.  This contract

incorporated the Davis-Bacon Act, and Circle C knew that the contract incorporated the Davis-Bacon

Act.  *See id*., ¶ 10.  Specifically, the contract required that all electrician wiremen be paid prevailing

wages – known as wage determinations– of a base hourly rate of $19.19, plus fringe benefits of $3.94 an hour, for work in Kentucky. *Id.*

Circle C knew about the Davis-Bacon Act requirements in this case. During the 1980s, Circle C co-owner Frances Cates and/or Circle C bookkeeper Dorothy Tyndall attended a training session provided by Fort Campbell about the prevailing wage requirement. *Id.*, ¶ 11. Circle C also acknowledged that it is generally "familiar with" the prevailing wage requirements in all of its contracts. *Id.*, ¶ 11.

Still more specifically, the Rule 30(b)(6) deponent for Circle C – John W. Cates – admitted that he knew the various Davis-Bacon Act requirements that Circle C had to follow. He testified that he knew:

- that Circle C had to pay electricians according to the wage determinations in the contract and that persons doing electrical work should be paid as electricians, *id.*, ¶ 13 & 16;

- that Circle C had to submit payroll certifications to Fort Campbell as a condition of payment, *id.*, ¶ 14;

- that Circle C had to ensure that its subcontractors were complying with the Davis-Bacon Act and that the payroll certifications submitted to Fort Campbell had to be complete and accurate and include information about Circle C's subcontractors, *id.*, ¶ 15; and

- that Circle C "should have" had a written contract with its subcontractor, *id.*, ¶ 16.

The United States served the original complaint in this case, which extensively details Circle C's duties under the contract and the Davis-Bacon Act, on John W. Cates as Circle C's agent on September 8, 2008. Doc. No. 19 (proof of service on Circle C); *see* Doc. No. 1 (complaint).

Circle C used Phase Tech, LLC (Phase Tech) as its subcontractor to perform at least 98 percent of the electrical work on the contract. *Id.*, ¶ 17. There was no written contract or other

2

documentation about this subcontract. *Id.*, ¶ 18.

Despite Circle C's knowledge of what it was required to do under the Davis-Bacon Act, Circle C did next to nothing to ensure that its subcontractor Phase Tech was complying with the law. Indeed, the only thing Circle C did in this regard was to give Phase Tech the determination excerpts from its contract. *Id.*, ¶ 19. Otherwise, Circle C:

- did not have a written agreement that spelled out Phase Tech's duty to follow the Davis-Bacon Act, *id.*, ¶ 18;

- did nothing to ensure that Phase Tech submitted its own payroll certifications to Fort Campbell, *id.*, ¶ 19;

- never discussed the Davis-Bacon Act requirements with Phase Tech, *id.*, ¶ 20;

- did not send anyone at Phase Tech to any training course on Davis-Bacon Act compliance, *id.*, ¶ 21;

- did not recall giving a blank payroll certification form to Phase Tech and normally only gave them to subcontractors who requested them, *id.*, ¶ 24;

- did not have a protocol or procedure for keeping track of what Phase Tech employees had worked on the Fort Campbell contract, *id.*, ¶ 26; and

- did not do anything to ensure that Phase Tech paid the proper wages required by the Davis-Bacon Act, *id.*, ¶ 22;

Moreover, Phase Tech co-owner Charles Cooper did not recall anyone at Circle C telling him in the early days of the contract that he needed to submit certified payrolls. *Id.*, ¶ 25. No one at Circle C told him this until approximately 2006, which was after he had been working on the contract for two years. *Id.*

Phase Tech had eight men, including Relator Brian Wall, who worked as its employees on the Fort Campbell contract. *Id.*, ¶¶ 27-28. All of these employees did electrical and conduit work, used the tools of the electrician's trade and did preparatory and finishing work for the electrical

3

wiring. *Id*. In short, they were acting as electricians. Seven of the nine delivery orders in this case were for work performed in Kenucky. *Id*., ¶ 29.

Phase Tech did not submit any payroll certifications during 2004 and 2005. *Id*., ¶ 30. Circle C submitted its own payroll certifications during this period (the original certifications), but they never listed any of Phase Tech's workers. *Id*., ¶ 31. During this same period, Circle C submitted separate, certified payrolls for its other subcontractors besides Phase Tech, and Phase Tech's bookkeeper knew that she should have submitted payroll information on all subcontractors. *Id*., ¶¶ 32-33.

After this case was filed and served on Circle C, Circle C asked Phase Tech to provide new payroll certifications for the years when Phase Tech and its employees were not included on any certified payrolls. *Id*., ¶ 34. Years after the fact, Phase Tech created these certifications covering the years 2004 and 2005 and gave them to Circle C in December 2008. *Id*., ¶¶ 34-35. Cooper knew at the time that these certifications were incomplete and testified that "I'm sure I told [John W. Cates] they weren't – they weren't complete." *Id*. Circle C did not do anything to verify that these new 2008 certifications were complete and accurate and instead submitted them to Fort Campbell. *Id*., ¶¶ 36-37.

Cooper created two types of contemporaneous records relevant to this case: (1) daily calendars that list the names of Phase Tech employees, what job site they were working on and the dates and times of their work and (2) pay stubs showing what his workers were paid each week. *Id*., ¶¶ 38-39. Circle C has no such documentation about Phase Tech employees working on the contract. *Id*., ¶ 26.

United States Department of Labor Special Agent Edison Gunter reviewed the payroll

4

certifications signed by Circle C and Phase Tech for the contract and Phase Tech's daily calendars and pay stubs. *Id.*, ¶ 40. Gunter found that there were 62 inaccurate or false payroll certifications. *Id.* Of these, 53 were Circle C's original payroll certifications from 2004 and 2005, ***which omitted all Phase Tech employees***, despite contemporaneous records showing that Phase Tech employees were working on the contract at the time. *Id.* The remaining 9 were the payroll certifications that Phase Tech signed and Circle C submitted in December 2008, which was well after Circle C was served with the complaint in this case. *Id.* Those 9 were inaccurate because the information about Phase Tech workers on those certifications ***did not match the contemporaneous Phase Tech documents*** about who was working on the contract and when. *Id.*

The December 2008 payroll certifications only list one certified electrician as ever having worked on the contract: Cooper. *Id.*, ¶ 41. The certifications classify everyone else as a "laborer" and paid them a wage rate of between $12 to $16 an hour, with the exception of one worker who was paid $17.45 at times.[1] *Id.* All of these wages are beneath what the contract required Circle C and its subcontractors to pay electrican wiremen: $19.19, plus fringe benefits of $3.94 an hour, for work in Kentucky. *Id.*, ¶ 10. The pay stubs that match the original 2004 and 2005 Circle C payroll certifications also show that the workers were always paid between $12 and $16 an hour, with the exception of one worker who was paid about $17 an hour. *Id.*, ¶ 41. As such, all 62 payroll certifications – both the original 53 Circle C certifications and the 9 Phase Tech certifications – were inaccurate, because they state that the proper wages were paid, when in fact the persons who were doing the work as laborers did not get paid what electricians working in Kentucky were entitled to receive. *Id.*

---

[1] The wages for Cooper are not listed.

Assistant District Director of the Louisville Office of the United States Department of Labor Karen Garnett believes that the original Circle C payroll certifications are false, since the contractor knew the subcontractor had people working on the contract, but failed to list them on the certified payroll. *Id.*, ¶ 42. She also believes that Circle C is responsible for the false December 2008 certifications, since Circle C was responsible for the inaccurate submissions of its subcontactor. *Id.*, ¶ 44. Finally – concerning both sets of certifications – Garnett opines that Phase Tech's employees should have been categorized and paid as electricians, both because they were doing electrical work and because it is a red flag for an electrical subcontractor to list only one electrician and show everyone else as a laborer. *Id.*, ¶ 43.

Both John W. Cates and Cooper were shown scores of payroll certifications and asked to compare them to Phase Tech's contemporaneous documents, and they admitted that the records do not match and are thus inaccurate. *Id.*, ¶ 45-46. John W. Cates further acknowledged that the certifications listed wages for Phase Tech employees that were less than what the Davis-Bacon Act required electricians to be piad. *Id.*, ¶ 45.

An agent for Circle C signed all of its payroll certifications, and Cooper signed all of the December 2008 Phase Tech certifications. *Id.*, ¶ 48. These certifications all included language to which signator agreed, saying that I "pay or supervise the payment of the persons employed by [Circle C or Phase Tech and] that during the payroll period . . . all persons employed on said project have been paid the full weekly - the full weekly wages earned . . .[and that] any payrolls . . . are correct and complete." *Id.*, ¶ 47. The certifications added that falsification of those statements could subject the contractor or subcontractor to civil prosecution. *Id.*

Fort Campbell paid Circle C a total of $565,109.91 for the electrical portion of the specific

6

delivery orders at issue in this case. *Id.*, ¶ 50. Assuming that Phase Tech performed 98% of this electrical work, that would amount to $553,807,71. *Id.* Had Fort Campbell known at the time that Circle C was submitting inaccurate or false payroll certifications in so far as Phase Tech's electrical work was concerned, Fort Campbell would not have paid that $553,807,71 to Circle C. *Id.*, ¶ 51. To the extent that Circle C may later allege that it identified Phase Tech in some fashion on different forms called quality control forms or daily field reports, Fort Campbell is clear that this would not have satisfied its contractual obligations and not have caused Fort Campbell to pay the $553,807,71 to Circle C. *Id.*, ¶ 52. Circle C has not repaid the money to the government. *Id.*, ¶ 53.

## III.    LEGAL ARGUMENT

As the Statement of Material Facts shows, there are no genuine issues of material fact left to be decided in this case. Accordingly, the United States' motion for summary judgment should be granted on the United States' claims in this case for both liability and damages.

### A.    Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides for summary judgment when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The threshold inquiry performed should be "whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A motion for summary judgment will fail if there is a genuine factual dispute, a genuine issue for trial, that would "require a jury or judge to resolve the parties's differing versions of the truth at trial." *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289 (1968). The key issue is "whether the evidence presents a sufficient disagreement to require

7

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."
*Anderson*, 477 U.S. at 251-252; *see Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 584 n.8
(6th Cir. 2003) (same). The party opposing summary judgment must present "'significant probative
evidence,'" not merely plausible evidence, to defeat the motion. *Wexler*, 317 F.3d at 584 n.8. Thus,
the district court must respect only reasonable inferences and disregard those that are far-fetched.
*Id*. Here, there is no genuine issue of material fact whatsoever, making summary judgment
appropriate.

**B.      The Davis-Bacon Act Requirements**

The Davis-Bacon Act requires that government contractors pay the prevailing wages set by
the Secretary of Labor to employees. 40 U.S.C. § 3142. Every such contract must contain
stipulations that "the contractor or subcontractor" shall pay its employees the wage determinations
listed in the contract. *Id*. § 3142(c). The contractor shall also "insert in any subcontracts the clauses
contained in 29 C.F.R. § 5.5(a)(1) through (10) [about wage determinations, proper pay and weekly
payroll certifications] and such other clauses as the [federal agency] may by appropriate instructions
require." 29 C.F.R. § 5.5(a)(6). "[L]aborers and mechanics shall be paid not less than the
appropriate wage determination for the classification of work ***actually performed***." 48 C.F.R. §
52.222-6(b)(3) (emphasis added); *see also* 48 C.F.R. § 52.222-6(c)(4) (emphasis added) (the wage
rate and fringe benefits shall be paid "to all workers ***performing*** work in the classification").

The Davis-Bacon Act requires contractors and subcontractors to furnish weekly payroll
certifications about what was paid to each employee during the prior week. *Id*. § 3145; 29 C.F.R.
§ 5.5(a)(3)(i) & (ii)(A)-(B). The applicable regulations stipulate that "[t]he prime contractor is
responsible for the submission of copies of payrolls by all subcontractors," *id*. § 5.5(a)(3)(ii)(A), and

8

that the "prime contractor shall be responsible for the compliance by any subcontractor or lower tier subcontractor with all the contract clauses in 29 CFR 5.5." *Id*. § 5.5(a)(6). "Payment of federal funds to the contractors are expressly contingent upon receipt of the contractors' weekly certifications of Davis-Bacon Act compliance." *In re: Schimmels*, 85 F.3d 416, 419 n.2 (9th Cir. 1996).

## C.      There Is No Genuine Dispute about Whether Circle C Is Liable under the FCA

### *1.      Elements of the FCA False Statements Claim*

The United States' first claim is for false statements in violation of the FCA, 31 U.S.C. § 3729(a)(2). Congress recently recodified this provision as 31 U.S.C. § 3729(a)(1)(B) in the Fraud Enforcement and Recovery Act of 2009 (FERA).

Before FERA's amendments, the FCA provided that liability attaches when a defendant knowingly makes a false statement "to get a false or fraudulent claim paid or approved by the government." 31 U.S.C. § 3729(a)(2). On June 7, 2008, the Supreme Court held in *Allison Engine* that the FCA required a party asserting liability to demonstrate that "the defendant intended the false record or statement be material to the Government's decision to pay or approve the false claim." *Allison Engine Co., Inc. v. United States ex rel. Sanders*, 128 S. Ct. 2123, 2126 (2008).[2] The Supreme Court found this intent requirement in the words "to get" in former § 3729(a)(2) - now § 3729(a)(1)(B). *Id.*

_____

[2] *Allison Engine* made clear that its "intent" holding referred to the defendant's awareness that its statement would potentially be relied upon by the government (as opposed to a private party), and not to the defendant's awareness of the truth or falsity of its statement. *See Allison Engine*, 128 S. Ct. at 2130 n.2 ("§ 3729(b) refers to specific intent with regard to the truth or falsity of the 'information,' while our holding refers to a defendant's purpose in making or using a false record or statement"). Hence, *Allison Engine* did not alter the False Claims Act's traditional standard for "knowledge," as set forth in 31 U.S.C. § 3729(b).

9

FERA subsequently amended the FCA to legislatively overrule *Allison Engine*. Specifically, FERA removed from § 3729(a)(1)(B) the words "to get" and replaced them with the words "material to." As amended, § 3729(a)(1)(B) now imposes liability when a defendant "knowingly makes . . . a false record or statement *material to* a false or fraudulent claim," P.L. 111-21, § 4(a) (emphasis added).[3] Additionally, Congress determined that this change should "take effect as if enacted on June 7, 2008 ," the date of the *Allison Engine* decision, and should "apply to all claims under the False Claims Act. . . that are pending on or after that date." *Id.*, § 4(f)(1).

Courts have differed as to whether the FERA amendments in § 3729(a)(1)(B) are retroactive. *Compare United States ex rel. Stephens v. Tissue Science Lab., Inc.*, – F. Supp.2d –, 2009 WL 3363727, *4 n.2 (N.D. Ga. Aug. 13, 2009) (attached as Ex. 1) (finding that the amendment is retroactive) *with United States ex rel. Sanders v. Allison Engine Co.*, – F. Supp.2d –, 2009 WL 3626773, *10 (S.D. Ohio Oct. 27, 2009) (attached as Ex. 2) (finding that the amendment was not retroactive). But this Court need not decide the issue, because the United States can show that the material facts establish an FCA violation under both the amended and pre-amended version of the false statements provison. *See Pearson v. Callahan*, 129 S.Ct. 808, 821 (2009) (courts should not pass on issues of constitutionality unless such adjudication is unavoidable).

The elements of the old 31 U.S.C. § 3729(a)(2) are as follows: First, "the defendant must have made a false statement or created a false record, and must have done so 'with 'actual knowledge,' 'deliberate ignorance,' or 'reckless disregard of the truth or falsity of the information.'" *United States ex rel. Snapp, Inc. v. Ford Motor Co.*, 532 F.3d 496, 505 (6th Cir. 2008); *see United*

---

[3] Material is now defined by the FCA as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3129(b)(4).

10

*States ex rel. Augustine v. Century Health Servs., Inc.*, 289 F.3d 409, 413 (6th Cir. 2002) (discussing knowledge standard under FCA). "[N]o proof of specific intent to defraud is required." 31 U.S.C. § 3729(b)(3). Second, there must be a claim for payment to the federal government. *Snapp*, 532 F.3d at 505. Third, the false statement "must have been made with the purpose of 'getting a false or fraudulent claim 'paid or approved by the Government.'"[4] *Snapp*, 532 F.3d at 505. Last, the false statement must have been material to the government's payment decision. *Id.*; *United States ex rel. A+ Homecare, Inc. v. Medshares Mgt. Group, Inc.*, 400 F.3d 428, 443 (6th Cir. 2005). This means that it must have a "natural tendency" to influence the decision-maker. *Medshares*, 400 F.3d at 445. As the statement of undisputed facts shows, all of these elements are satisfied here.

### a. The False Statement and Knowledge Element Is Met

The first element has two components: a false statement and knowledge. The facts in this case establish both aspects.

Initially, Circle C made or used, or caused to be made or used, a false statement or record: the original Circle C payroll certifications and the December 2008 Phase Tech payroll certifications. Circle C made and used its own false payroll certifications. And by submitting the Phase Tech December 2008 payroll certifications to Fort Campbell, Circle C also used or caused those false certifications to be used. Both sets of certifications are literally false, because (1) they falsely certify that the payrolls are complete and accurate, when they actually entirely omit or inaccurately list Phase Tech employees and (2) the certifications falsely certify that Circle C and/or Phase Tech paid

---

[4] If the Court decided that the FERA amendments were retroactive, this element would drop out under the new version of § 3729(a)(1)(B). *See* S. Rep. No. 111-10, at 12, 111th Cong., 1st Sess. 10 (March 23, 2009) ("To correct the *Allison Engine* decision, . . . [i]n section 3729(a)(2) the words 'to get' were removed striking the language the Supreme Court found created an intent requirement for false claims liability under that section.).

11

the prevailing wages to all employees, when in fact the Phase Tech electrical workers other than Cooper were not paid the prevailing wages in Kentucky, where most of the contract work occurred. *See United States v. Pres. & Fellows of Harvard College*, 323 F. Supp.2d 151, 181 (D. Mass. 2004) (finding Harvard's certifications in FCA case to be "literally false").

Despite the overwhelming factual evidence about this falsity, the United States anticipates that Circle C will argue that none of the original Circle C payroll certifications were false, since they included Circle C's own workers and only excluded Phase Tech's employees. But the Davis-Bacon Act, the contract and caselaw firmly provide that the contractor is responsible for its subcontractor and cannot escape liability by sticking their head in the sand like an ostrich. As the Eleventh Circuit has recognized, the Davis-Bacon Act:

> requires that "every contract based upon these specifications shall contain a stipulation that the contractor or his subcontractor shall pay all mechanics and laborers" the federally mandated wages. 40 U.S.C. § 276a(a) (emphasis added) [since recodified as 40 U.S.C. § 3142]. Federal regulations applicable to contracts and subcontracts under the Davis-Bacon Act provide, "The prime contractor shall be responsible for the compliance by any subcontractor or lower tier subcontractor. . . ."

*National Fire Ins. Co. of Hartford v Fortune Const. Co.*, 320 F.3d 1260, 1276 (11th Cir. 2003). The Eleventh Circuit went on to note that the contractor "is required by law, as well as by public policy, to ensure compliance by its subcontractors with the Davis-Bacon Act." *Id*. at 1277 n.20; *see Ball, Ball & Brosamer, Inc. v. Reich*, 24 F.3d 1447, 1449 n.1 (D.C. Cir. 1994) ("As the prime contractor, Ball was equally responsible for the repayment of unpaid wages to [its subcontractor's] workers"); *Mohr v. J. Pease Const. Co.*, 1994 WL 171512, *1 (N.D. Ill. May 2, 1994) (attached as Ex. 3) ("It is as much the prime contractor's responsibility as the subcontractor's to insure that all employees covered by the Davis-Bacon Act are properly paid prevailing wages").

12

Furthermore, the Sixth Circuit has rejected arguments about the onerousness of compliance:

[P]arties that contract with the government are held to the letter of the contract – irrespective of whether the contract terms appear onerous from an ex post perspective, or whether the contract's purpose could be effectuated in some other way – under the maxim that "[m]en must turn square corners when they deal with the Government."

*United States ex rel. Compton v. Midwest Spec., Inc.*, 142 F.3d 296, 302 (6th Cir. 1998). The Sixth Circuit agreed that this "'square corners' rule applie[d] fully in the False Claims Act context." *Id*. at 302 n. 4.

Here, Circle C's government contract required it to abide by the Davis-Bacon Act and to ensure that its subcontractors were in compliance too. The regulations and the contract that incorporated them also required Circle C to have a subcontract with its subcontractors that incorporated all the regulatory requirements about payroll certifications and prevailing wages. *See supra* § III.B. Circle C failed to have any written subcontract with Phase Tech – much less one that contained the Davis-Bacon Act requirements. Circle C likewise failed to ensure that Phase Tech complied with the Davis-Bacon Act and therefore Circle C's payroll certifications that certify such compliance and that omit Phase Tech's workers while certifying that the certifications are accurate and complete, are false. The certifications are also false, because they wrongly certify that prevailing wages were paid, when the facts show that they were not paid to Phase Tech's workers. *See United States v. Pres. & Fellows of Harvard College*, 323 F. Supp.2d 151, 180-81 (D. Mass. 2004) (finding that certifications that disbursements "were made for purposes and conditions of the grant or agreement" were false, when facts showed that this was not the case).

Circle C acted with reckless disregard towards the truth or falsity of the payroll certifications at issue. All the facts establish that Circle C knew the applicable law and contractual provisions and

13

yet recklessly disregarded them by submitting the false payroll certifications anyway. Though Circle C may insist that it had no specific intent to defraud, the United States need not show such intent under the FCA. *See United States v. Krizek*, 111 F.3d 934, 941-42 (D.C. Cir. 1997) (finding reckless disregard in submission of Medicare claims); *United States v. Stevens*, 605 F. Supp.2d 863, 869-69 (W.D. Ky. 2008) (finding reckless disregard by doctor, who "failed to take any reasonable steps to ensure his billings were correct" and granting summary judgment to government in FCA case).

### b. The Claim Element Is Satisfied

Third, there was a false claim: the false payroll certifications. The FCA count in this case is brought under a "false certification" theory, in which a claim is considered false where eligibility for payment from the government is expressly or implicitly contingent on a party's compliance with some contractual term, law or regulation. The Sixth Circuit and many other courts have found FCA violations using a false certification theory. *See e.g.*, *Medshares*, 400 F.3d at 454 n.20 (noting that Sixth Circuit has adopted implied certification theory, "which holds a defendant liable for violating the 'continuing duty to comply with the regulations on which payment is conditioned'"); *Augustine*, 289 F.3d at 415 (adopting false implied certification theory of liability where a defendant "violates its continuing duty to comply with the regulations on which payment is conditioned"); *United States ex rel. Landers v. Baptist Memorial Health Care Corp.*, 525 F. Supp.2d 972, 978 (W.D. Tenn. 2007) (defendants may be held liable under false certification theory if a party certifies compliance with a statute or regulation as a condition of governmental payment); *United States v. Rogers*, 2001 818160, *6 (E.D. Tenn. June 28, 2001) (attached as Ex. 4) (same)

In our case, both the statute and the regulations require payroll certifications. *See supra* § III.B. The contract that Circle C signed also expressly incorporated these legal provisions.

Furthermore, "[p]ayment of federal funds to the contractors are expressly contingent upon receipt of the contractors' weekly certifications of Davis-Bacon Act compliance." *Schimmels*, 85 F.3d at 419 n.2. The statement of facts also shows that Fort Campbell would not have paid Circle C if had known about the false payroll certifications. As such, Circle C submitted false certifications that were conditions of governmental payment, so the false claim element is satisfied.

        **c.**      **The False Payroll Certifications Were Made to Get a False Claim Paid**

This element founded in *Allison Engine* concerns a defendant's awareness that its statement would potentially be relied upon by the government (as opposed to being relied on by a private party). *See Allison Engine*, 128 S. Ct. at 2130 n.2. All the facts demonstrate that Circle C knew that Fort Campbell – a government actor – would rely on its payroll certifications. Thus, this element is clearly met.

        **d.**      **The False Payroll Certifications Were Material to Fort Campbell's Payment Decision**

As the applicable law and the statement of facts with Jeanne Shykes declaration show, the payroll certifications influenced – and at the very least had the natural tendency to influence – Fort Campbell's decision to pay Circle C under the contract. *See United States ex rel. Anti-Discrimination Center of Metro New York, Inc. v. Westchester Cty.*, 2009 WL 1110572, *2 (S.D.N.Y. Apr. 22, 2009) (citations omitted) (attached as Ex. 5) (fact that "certifications were false unquestionably 'ha[d] a natural tendency to influence, or [were] capable of influencing' HUD's decision to pay out government funds' id., and therefore the false certifications meet the test for materiality as a matter of law"); *Harvard College*, 323 F. Supp.2d at 186 (materiality turns on whether a failure to certify could have caused government to refuse to make payments). Therefore, this last element is satisfied too.

15

**2.    *The Davis-Bacon Act's Administrative Procedures Do Not Foreclose this FCA Claim***

The United States anticipates that Circle C will argue that the Davis-Bacon Act's administrative scheme precludes FCA enforcement of Davis-Bacon rights.  But as a general matter, the Sixth Circuit has already recognized that the "FCA is the exclusive remedy provided by Congress to recover for fraudulent claims made against the Government." *Medshares*, 400 F.3d at 456.  More specifically, courts have rejected the argument that the Davis-Bacon Act somehow precludes use of an FCA remedy.  *See Foundation for Fair Contracting, Ltd. v. G & M Eastern Contracting & Double E, LLC*, 259 F. Supp.2d 329, 339-40 & n.9 (D.N.J. 2003); *United States ex rel. IBEW v. G.E. Chen Construction, Inc.*, 954 F. Supp. 195, 197 (N.D. Cal. 1997) (Department of Labor does not have full jurisdiction over violations like false payroll certifications, which can be an FCA violation).

The only case that even arguably supports Circle C in this regard is *United States ex rel. Windsor v. Dyncorp, Inc.*, 895 F. Supp. 844 (E.D. Va. 1995).  That decision found that (1) submitting *late* payroll certifications did not constitute a false claim under the FCA and (2) the Department of Labor has sole responsibility for resolving classification disputes under the Davis-Bacon Act. *Dyncorp*, 895 F. Supp. at 852. Of course, the present case is not about the submission of *late* payroll certifications.  Moreover, the *Dyncorp* decision went on to note that "[w]here the contractor's statement may be determined to be false without regard to complex Davis-Bacon Act classification regulations, then a Davis-Bacon Act violation may form the basis of an FCA suit." *Id*.   Here, the certifications can be considered false without regard to complex regulations.  This is because their falsity hinges on 2 things: (1) the false certification that the payrolls were true and accurate, when they were not, and (2) the false certification that prevailing wages were paid, which was untrue.

**3.    *Government Knowledge Is Not a Defense***

16

The United States also expects that Circle C may claim that it put Fort Campbell on notice that Phase Tech was a subcontractor by listing it on certain quality control reports or daily field reports. Even accepting this allegation as true, it would not relieve Circle C of liability for its false payroll certifications. To prevail on this type of argument in an FCA case, "the defendant and the government must have been in an 'ongoing dialogue' about the activities underlying the case and must have 'so completely cooperated and shared all information' that a defendant could not have knowingly submitted false claims." *United States ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp.*, 2009 WL 3161828, *7 (D. Colo. Sept. 30, 2009) (attached as Ex. 6). Since the false payroll themselves show that Circle C will not be able to meet the "completely shared all information" requirement and since Jeanne Shykes indicated that knowledge of the quality control persons at Fort Campbell is not imputed to its Contract office, this argument has no merit.

**D.      There Is No Genuine Dispute that Circle C Is Liable for Unjust Enrichment**

Count two in the United States' complaint is for unjust enrichment. Under this equitable theory, "a person is unjustly enriched if the retention of [a] benefit would be unjust." Restatement of Restitution, § 1 (1937). The United States may assert an unjust enrichment claim against a provider that has received benefits under a federal contract when it would be unjust for that provider to retain those benefits. It is appropriate for courts to apply federal common law when determining the rights or duties of the United States under a federal program. *Clearfield Trust Co. v. United States*, 318 U.S. 363, 366 (1943); *State of Tennessee ex rel. Leech v. Dole*, 749 F.2d 331, 336 (6th Cir. 1984) (can use federal common law unjust enrichment claim when the federal share granted is paid for particular purposes subject to definite conditions). "The elements of a federal common law claim of unjust enrichment are: (1) the Government had a reasonable expectation of payment, (2)

17

[the defendant] should reasonably have expected to pay, *or* (3) 'society's reasonable expectations of person and property would be defeated by nonpayment.'" *United States v. Rogan*, 459 F.Supp.2d 692, 728 (N.D. Ill. 2006) (citations omitted) (emphasis added), *aff'd*, 517 F.3d 449 (7th Cir. 2008).

Here, for the reasons discussed above, Circle C was unjustly enriched when it received a benefit from the United States in the form of contractual payments for electrical work that it was not entitled to receive, in view of its non-compliance with the contract's Davis-Bacon Act requirements. Given Circle C's blatant and long-term disregard of the certified payroll requirements of listing its subcontractor's employees and ensuring that the subcontractor was paying the Davis-Bacon required-wages, at a minimum, the United States (a victim of the misconduct) is entitled to recover from Circle C the substantial benefits that accrued to it by virtue of its non-compliance. It would be unjust for Circle C to retain the payments for the electrical portion of the contract, because Circle C was not entitled to such payments as a result of its contractual violations.

## E.     There Is No Genuine Dispute that Circle C Is Liable for Payment by Mistake

Count three in the United States' complaint is for payment by mistake. The United States has an inherent right to recover government funds lost through the wrongful or erroneous acts of its agents. *See United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 15-16, n.16 (1st Cir.). "The Government by appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid. No statute is necessary to authorize the United States to sue in such a case. The right to sue is independent of statute." *United States v. Wurts*, 303 U.S. 414, 415 (1938). To recover payments under this cause of action, the United States must show that payments of federal monies were made in an erroneous belief, which was material to the decision to pay. *See United States v. Mead*, 426 F.2d 118, 124 (9th Cir. 1970); *Trustees of the Painters Union Deposit Fund v.*

18

*Interior/Exterior Specialist Co.*, 2008 WL 724355, *21 (E.D. Mich. Mar. 18, 2008) (attached as Ex. 7) (federal common law mistake of fact claim exists when person under some erroreous conviction of fact or law does something that they would not do *but for* the mistake). Under its claim of payment by mistake, the United States does not need to demonstrate that the defendant knew the claims were false. *Mead*, 426 F.3d at 125, n.6. Rather, the United States must show only that it paid the defendant money based on a factual mistake.

Here, the United States has clearly shown that it paid Circle C money for the electrical portion of the contract based on a factual mistake – e.g., the Directorate of Contracting at Fort Campbell's misimpression that Circle C's payroll certifications were accurate and complete and properly reflected that prevailing wages were paid. As such, summary judgment should be granted on this claim.

**F.      There Is No Material Dispute Over the Amount of Damages**

As a general matter, "[d]amages awarded under the False Claims Act typically are liberally calculated to ensure that they 'afford the government complete indemnity for the injuries done it.'" *Compton*, 142 F.3d at 304 (6th Cir. 1997) (citation omitted). "Ordinarily the proper measure of damages in a FCA case is the difference between what the government actually paid out by reason of the false claim over and above what it would have paid had the government known the true facts." *Rogers*, 2001 818160, *32 (E.D. Tenn. June 28, 2001) (Ex. 4); *accord United States v. Mackby*, 339 F.3d 1013, 1018 (9th Cir. 2003).

In *Mackby*, the court of appeals determined that the fact that a clinic actually performed the services at issue did not eliminate the government's harm, because the government would not have paid the claims if it had known that the doctor was misappropriating someone else's Medicare

19

number.  *Id.*  Similarly, the Seventh Circuit in *United States v. Rogan* held that the government's

damages for Medicare claims in violation of the Stark Act's prohibition on kickbacks are the totality

of the funds that Medicare paid out, even when the medical services were actually provided to the

Medicare beneficiary.  517 F.3d 449, 453 (7th Cir. 2008) ("[n]or do we think it important that most

of the patients for which claims were submitted received some medical care - perhaps all of the care

reflected in the claims forms. . . .'); *see also United States v. Ekelman & Assoc.*, 532 F.2d 545, 551

(6th Cir. 1976) (finding that the government was entitled to the reasonable expenses of maintaining

property that government would not have incurred but for the fraud); *United States v. Sci. Appl. Int'l

Corp.*,  – F. Supp.2d. –, 2009 WL 2929250, *16 (D.D.C. Sept. 14, 2009) (attached as Ex. 8)

(upholding jury instruction that jury should not account for value of defendant's work because, but

for the false claims, defendant would not have paid anything for the work).

Moreover, in *United States v. Macomb Contracting Corp.*, then Magistrate Judge Haynes

concluded in an FCA case about an illegal scheme in which a defendant bid for a government

contract and used an ineligible subcontractor to do part of the work, that the amount of the

government's damages was the "amount of money paid to Macomb for no work on the project."

1988 U.S. Dist. LEXIS 17608, *114-15 (M.D. Tenn. Oct. 14, 1988) (attached as Ex. 9), *adopted with

stated modifications in United States v. Macomb Contracting Corp.*,  763 F. Supp. 272 (M.D. Tenn.

1990).

In this case, the statement of facts establishes that Fort Campbell had $553,807,71 in actual

damages, because Fort Campbell would not have paid that money if it had known about the false

certifications.

Under the FCA, violators are liable to the United States for three times its actual damages.

20

*See* 31 U.S.C. § 3729(a)(7). Granting summary judgment and ordering that Circle C pay $1,661,423.13 as treble damages is therefore appropriate.[5]

## G.    Civil Penalties

Under the FCA, defendants are liable to the United States for a civil penalty of between $5500 to $11,000 for each false claim. 31 U.S.C. § 3729(a)(7); 28 C.F.R. § 85.3(9). Given the seriousness of Circle C's conduct – including its submission of false certifications even after this suit was filed – the United States asks the Court to impose a civil penalty of $11,000 for each of the 62 false claims in this case, for a total of $682,000 in civil penalties, in addition to the treble damages set forth above.

## IV.    CONCLUSION

The material facts contained in the United States' Rule 56.01(b) Statement cannot be disputed. They collectively prove that Circle C knowingly violated the FCA and was unjustly enriched and paid by mistake. Therefore, the United States asks that the Court enter judgment for the United States and, pursuant to 31 U.S.C. § 3729(a)(7), award $1,661,423.13 in treble damages, and $682,000 in civil penalties.

---

[5] In so far as the common law claims are concerned, these violations bring single damages, plus interest. Therefore, the FCA damages would be higher than the common law damages, so this Court need not address them.

21

Respectfully submitted,

EDWARD M. YARBROUGH
United States Attorney

By:     s/ Ellen Bowden McIntyre
        Assistant United States Attorney
        Suite A-961
        110 Ninth Avenue South
        Nashville, TN 37203
        (615) 736-2125


## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was sent by United States mail, electronic delivery, and/or other proper means of service, to **Perry Craft** and **Matthew Wright**, 214 Centerview Drive, Suite 233, Brentwood, TN 37027; **James Sewell Higgins** and **Jonathan Allen Street**, 116 Third Avenue South, Nashville, TN 37201; **D. Sean Nilsen** and **C. Dean Furman**, 2527 Nelson Miller Pkwy., Suite 101, Louisville, KY 40223, this 13th day of November, 2009.


s/Ellen Bowden McIntyre

22