# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

UNITED STATES OF AMERICA )
*ex rel.* BRIAN WALL, )
            ) NO. 3:07-0091
       Plaintiff, ) JUDGE HAYNES
            )
v. )
            )
CIRCLE CONSTRUCTION, LLC, )
            )
       Defendant. )

## M E M O R A N D U M

Plaintiff, Brian Wall, as Relator, filed this action on behalf of the United States under the

False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)(B), against the Defendants: Circle C

Construction, Inc., ("Circle C") and Phase Tech, Inc. The United States later joined this action

and filed its complaint and was granted leave to file an amended complaint. In essence,

Plaintiffs' claims are that Circle C knowingly submitted false payroll certifications to the

Department of the Army in violation of its agreement to abide by the Davis-Bacon Act

requirements in the construction of buildings on the Fort Campbell military facility in

Clarksville, Tennessee. The Defendants denied liability and the parties engaged in discovery.

Plaintiffs later settled and dismissed their claims against Phase Tech. (Docket Entry No. 63).

Before the Court are the following motions: (1) the United States's and Relator's motion

for summary judgment (Docket Entry No. 73); (2) Circle C's motion for judgment on the record

(Docket Entry No. 85); and (3) the Defendant Circle C's motion to dismiss amended complaint

(Docket Entry No. 99). Of these motions, the Court considers Circle C's motions first.

## A. Circle C's Motions

In its motions to dismiss and for judgment on the record (Docket Entry Nos. 85 and 99), Circle C contends that Plaintiff's amended complaint fails to meet the heightened pleadings requirements of Fed. R. Civ. P. 9(b) and that the Department of Labor ("DOL") has primary jurisdiction under the Davis-Bacon Act over Plaintiff's claims about Phase Tech's employees' wages in different job classifications. Plaintiffs respond that Circle C's motions are untimely given its answer to the amended complaint and the Court's Order setting the deadline for dispositive motions has passed.

The Court granted the United States's motion for leave to file its amended complaint on October 23, 2008. (Docket Entry No. 41). On March 27, 2009, Circle C filed an Answer to the Amended Complaint. (Docket Entry No. 56).[1] On December 30, 2009, the Clerk's Office re-filed the United States's amended complaint with a separate docket number. See Docket Entry No. 94. The Clerk's Office's failure to assign a new docket entry number to the amended complaint upon the filing of the March 30, 2009 Order granting leave to file an amended complaint is a technical error. Upon Circle C's motions, the deadline for dispositive motions was November 13, 2009. (Docket Entry No. 71).

These motions were filed after that deadline for dispositive motions in the Court's case management order. The Court deems Circle C's motions to be untimely. The Clerk's office's technical error does not allow Circle C to file its motion to dismiss. "[O]rdinarily, a motion for judgment on the pleadings should be made promptly after the close of the pleadings. If a party

---

[1]Defendant Phase Tech, LLC filed its answer to the Amended Complaint on November 14, 2008. See Docket Entry No. 46.

2

engages in excessive delay before moving under Rule 12(c), the district court may refuse to hear

the motion on the grounds that its consideration will delay or interfere with the commencement

of the trial." 5C Wright & Miller, Fed. Practice & Proc. § 1367, at 215-16 (3d ed. 2004). A Rule

12(b) motion "must be made before pleading if a responsive pleading is allowed." Thus, Circle

C's answer precludes its motions to dismiss. Hester v. United Healthcare Ins. Co., No. 1:08-cv-

105 2009 WL 128303, at *1 (E.D. Tenn. Jan 16, 2009). Moreover, courts have rejected the

argument that the Davis-Bacon Act somehow precludes use of an FCA remedy, where, as here,

the specific issue is the amount of wages paid. See Foundation for Fair Contracting, Ltd. v. G &

M Eastern Contracting & Double E, LLC, 259 F. Supp. 2d 329, 339-40 & n.9 (D.N.J. 2003);

United States ex rel. IBEW v. G.E. Chen Construction, Inc., 954 F. Supp. 195, 197 (N.D. Cal.

1997). The Court also concludes that under Fed. R. Civ. P. 12(h), Circle C's motions are

untimely and that Circle C's prior answer waived its right to file these motions.

## B. United States's Motion for Summary Judgment

### 1. Findings of Fact[2]

---

[2]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Applying the applicable law, the Court concludes that there are not any material factual disputes and this section constitutes findings of fact under Fed. R. Civ. P 56(d). See Docket Entry No. 81, Defendant's Response to Plaintiff's Statement of Undisputed Facts.

As set forth infra, given the state of the law and Circle C's contract provisions that incorporate its certification obligation for wages of its subcontractor employees, whether the Fort Campbell contracting office Department of Public Works administered the relevant contract is not material nor is whether Circle C is an indirect employer of Phase Tech. Given the contractual language, Circle C knew of its wage obligations to Phase Tech employees. The

3

Circle C signed an agreement with the Army to construct buildings at the Fort Campbell military base. Circle C's agreement included determinations of hourly wages for electrical workers with a base hourly rate of $19.19, plus fringe benefits of $3.94 an hour. Prior to this contract, Circle C has had government contracts for almost twenty (20) years. Frances Cates, a Circle C co-owner, and Dorothy Tyndall, Circle C's bookkeeper, attended a training session at Fort Campbell on the prevailing wage requirement for federal government contracts. In this Fort Campbell contract, Circle C acknowledged its "familiarity with" the prevailing wage requirements in all of its contracts. (Docket Entry No. 91, Defendant's Response to Plaintiffs Statement of Undisputed Facts at ¶ 11). John W. Cates, Circle C's corporate representative conceded Circle C's knowledge of various Davis-Bacon Act requirements. Id. at ¶ 14.

Among Circle C's contractual obligations on the Fort Campbell project were Circle C's obligations to pay electricians according to the wage determinations in the contract, to ensure that persons doing electrical work were paid as electricians; to submit payroll certifications to Fort Campbell as a condition of payment; and to ensure that its subcontractors complied with Davis-Bacon Act and that the payroll certification submitted to Fort Campbell were complete and accurate, including information on Circle C's subcontractors. Circle C conceded that it "should submit payroll certifications for all employees on the Fort Campbell project. (Docket Entry No. 75-1 at 12, Exhibit 3). Circle C submitted its payroll certifications for the original certifications, but did not list Phase Tech's employees. Circle C asserts that it never promoted itself as the prime contractor on this project. Yet, during this same period, Circle C submitted separate

United States' settlement with Phase Tech is at best only relevant to a set off against the amount of damages awarded. Whether Circle C was prohibited from listing Phase Tech's employees on its payroll certification presents a legal issue not a factual dispute.

4

certified payrolls for its other subcontractors. Phase Tech did not submit any payroll certification for 2004 and 2005.

Phase Tech was Circle C's subcontractor on at least 98 percent of the electrical work on the Fort Campbell project, but did not sign a written contract with Circle C. Circle C provided Phase Tech with the wage determination excerpts from its contract, but did not discuss the Davis-Bacon Act requirements with Phase Tech nor verify whether Phase Tech submitted its own payroll certifications to Fort Campbell. Circle C did not provide a blank payroll certification form to Phase Tech. Circle C lacked a protocol or procedure to monitor Phase Tech's employees' work on the Fort Campbell project and did not take measures to ensure payment of proper wages under the Davis-Bacon Act to Phase Tech's employees. According to Charles Cooper, Phase Tech co-owner and certified electrician, Circle C did not inform Phase Tech of the need to submit certified payrolls for the Fort Campbell project until approximately 2006, two years after the project commenced.

Phase Tech had eight employees, including Wall, who worked on the Fort Campbell contract, performed electrical and conduit work as electricians. Wall, the relator, and Ryan McPherson were Phase Tech employees on a construction project for which Circle C was the prime contractor and Phase Tech was a subcontractor. Wall also performed preparatory and finishing work for the electrical wiring on the Fort Campbell project. According to John W. Cates, Circle C's corporate representative for this project, Circle C neither supervised, directed nor paid for Wall's or McPherson's work on Fort Campbell's contract. Circle C notes that it was neither asked or requested to pay or supervise the payment of Wall or McPherson.

After this action was filed, Circle C asked Phase Tech to provide new payroll

5

certifications for the years when Phase Tech's employees were not included on any certified payrolls. Phase Tech provided this information to Circle C in December 2008. Phase Tech's contemporaneous records include daily calendars with the names of Phase Tech employees and their assigned job sites as well as dates and times of their work. Phase Tech also has pay stubs, but not for Phase Tech employees on the Fort Campbell project. According to Cooper, Phase Tech's owner at the time that these certifications were completed, "I'm sure I told [John W. Cates] they weren't - they weren't complete." (Docket Entry No. 75-8 at p. 50). Circle C never verified these 2008 certifications for completeness and accuracy, but submitted them to Fort Campbell officials.

Edison Gunter, Special Agent with the United States Department of Labor ("DOL") reviewed Circle C's and Phase Tech's certifications for the Fort Campbell contract as well as Phase Tech's daily calendars and pay stubs. Gunter found 62 inaccurate or false payroll certifications of which 53 were Circle C's original payroll certifications from 2004 and 2005. Despite contemporaneous records of Phase Tech employees on the project, Circle C did not list Phase Tech's employees. Of the payroll certifications Phase Tech signed and Circle C submitted in December 2008, nine (9) certifications were inaccurate because certification for Phase Tech workers did not match Phase Tech's contemporaneous documents for workers on the project.

In the December 2008 payroll certifications, Circle C listed one certified electrician for this project who was paid at the hourly wage of $12 to $16 an hour. Id. The wages on these certifications are below the rates on the Circle C's contract for its subcontractors' electrical workers that required a wage of $19.19 per hour, plus fringe benefits of $3.94 an hour for work in Kentucky. The pay stubs of the original 2004 and 2005 Circle C payroll certifications also

6

reflect the workers' pay between $12 and $16 an hour. Thus, 62 payroll certifications contained non-complying hourly wages for laborers as well as an electrical worker on the payroll, with the exception of one worker who was paid about $17 an hour.

Karen Garnett, assistant district director in the DOL's Louisville Office found Circle C's original payroll certifications to be false, because Circle C knew its subcontractor Phase Tech had employees working on the contract, but failed to list those employees on its certified payrolls. According to Garnett, Circle C is also responsible for the false December 2008 certifications because Circle C was responsible for the inaccurate submissions of its subcontractor. For all certifications, Phase Tech's employees should have been categorized and paid as electricians because they performed electrical work. Garnett considered listing only one electrician with all other employees as laborers to be a red flag.

Cates and Cooper who were shown comparisons of Circle C's payroll certifications and Phase Tech's contemporaneous documents, admitted that the certifications and records were inaccurate. Cates acknowledged that the wages listed for Phase Tech employees in the certification were less that the Davis-Bacon Act requirement for electrical workers. Circle C's and Phase Tech's December 2008 certifications include the provision that certifying representative states that "I pay or supervise the payment of the persons employed by [Circle C or Phase Tech and] that during the payroll period . . . all persons employed on said project have been paid the full weekly - the full weekly wages earned . . . [and that] any payrolls . . . are correct and complete." (Docket Entry No. 80, Gunter Declaration at pp. 3-4). The certifying agents also know that false statements in these certifications could subject the contractor or subcontractor to civil prosecution.

7

For this Fort Campbell project, the United States paid Circle C a total five hundred sixty-five thousand, one hundred nine dollars ninety one cents ($565,109.91) for the electrical portion of this project based upon specific delivery work orders for electrical work cites without dispute that all of Phase Tech's employees performed electrical works on this project. (Docket Entry No. 75, Plaintiff's Statement of Undisputed Facts at Exhibit 6, Cooper Deposition at p. 42). Phase Tech performed 98% of this project's electrical work that represents a total payment of five hundred fifty-three thousand eight hundred seven dollars seventy-one cents ($553,807.71), that was given to Circle C and is the actual amount that should have been paid to Phase Tech's electrical and other workers.

## 2. Conclusions of Law

"The very reason of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment <u>sua sponte</u>, so long as the opposing party was on notice that she had to come forward with all of her evidence." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326 (1986). <u>Accord</u>, <u>Routman v. Automatic Data Processing, Inc.</u>, 873 F.2d 970, 971 (6th Cir. 1989).

In <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment `shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere

8

existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.

<u>As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.</u> Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no `genuine issue for trial.'" <u>Matsushita Electrical Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. <u>Emmons v. McLaughlin</u>, 874 F.2d 351, 355-57 (6th Cir. 1989). <u>But</u> <u>see</u> <u>Routman v. Automatic Data Processing, Inc.</u>, 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Court in <u>Celotex</u>:

Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

<u>Celotex</u>, 477 U.S. at 323 (emphasis deleted).

9

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991) (quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of `demonstrating the absence of a genuine issue of material fact,' the nonmoving party then `must set forth specific facts showing that there is a genuine issue for trial.'" Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989) (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty Lobby). Moreover, the Court of Appeals explained that

> The respondent must `do more than simply show that there is some metaphysical doubt as to the material facts.' Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is `implausible.'

Street, 886 F.2d at 1480 (citations omitted).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, summary judgment will not lie if the dispute about a material fact is `genuine' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

* * *

10

Progressing to the specific issue in this case, we are convinced that <u>the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits</u>. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, <u>the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented</u>. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. <u>The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- `whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.</u>'

<u>Liberty Lobby</u>, 477 U.S. at 248, 252 (citation omitted and emphasis added).

It is likewise true that

[I]n ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: `The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

<u>Bohn Aluminum & Brass Corp. v. Storm King Corp.</u>, 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." <u>Duchon v. Cajon Company</u>, 791 F.2d 43, 46 (6th Cir. 1986) <u>app.</u> 840 F.2d 16 (6th Cir. 1988) (unpublished opinion) (citation omitted).

The Court of Appeals further explained the District Court's role in evaluating the proof on a summary judgment motion:

A district court is not required to speculate on which portion of the record the

11

nonmoving party relies, nor is it obligated to wade through and search the entire
record for some specific facts that might support the nonmoving party's claim.
Rule 56 contemplates a limited marshalling of evidence by the nonmoving party
sufficient to establishing a genuine issue of material fact for trial.  This
marshalling of evidence, however, does not require the nonmoving party to
"designate" facts by citing specific page numbers.  Designate means simply "to
point out the location of."  Webster's Third New InterNational Dictionary (1986).

Of course, the designated portions of the record must be presented with enough
specificity that the district court can readily identify the facts upon which the
nonmoving party relies; but that need for specificity must be balanced against a
party's need to be fairly apprised of how much specificity the district court
requires.  This notice can be adequately accomplished through a local court rule or
a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989).  Here, the parties have given

some references to the proof upon which they rely.

    In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions,

and other authorities on summary judgment and synthesized ten rules in the "new era" on

summary judgment motions

    1.    Complex cases are not necessarily inappropriate for summary judgment.

    2.    Cases involving state of mind issues are not necessarily
    inappropriate for summary judgment.

    3.    The movant must meet the initial burden of showing `the absence of a
    genuine issue of material fact' as to an essential element of the non-movant's case.

    4.    This burden may be met by pointing out to the court that the respondent,
    having had sufficient opportunity for discovery, has no evidence to support an
    essential element of his or her case.

    5.    A court should apply a federal directed verdict standard in ruling on a
    motion for summary judgment.  The inquiry on a summary judgment motion or a
    directed verdict motion is the same: `whether the evidence presents a sufficient
    disagreement to require submission to a jury or whether it is so one-sided that the
    party must prevail as a matter of law.'

12

6.      As on federal directed verdict motions, the `scintilla rule' applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7.      The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8.      The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9.      The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10.     The trial court has more discretion than in the `old era' in evaluating the respondent's evidence.  The respondent must `do more than simply show that there is some metaphysical doubt as to the material facts.'  Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted.  The trial court has at least some discretion to determine whether the respondent's claim is `implausible.

Street, 886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment:  (1) has the moving party "clearly and convincingly" established the absence of material facts?;  (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

The Davis-Bacon Act requires government contractors to pay the prevailing wages set by the Secretary of Labor to employees on government projects.  40 U.S.C. § 3142.  The Davis-Bacon Act's protections are to "give local laborers and contractors fair opportunity to participate

13

in building programs when federal money is involved and protect local wage standards by preventing contractors from basing their bids on wages lower than those prevailing in the area." Williams J. Lang Land Cleaning, Inc. v. Admin., Wage & Hour Div., U.S. Dep't of Labor, 520 F. Supp. 2d 870, 877 (E.D. Mich. 2007) (citations omitted). This remedial statue should be "liberally construed to effectuate its beneficent purpose." Id.

Under the Davis-Bacon Act, these government contracts must include stipulations that "the contractor or subcontractor" shall pay its employees the wage determinations listed in the contract, 40 U.S.C. § 3142(c) and Davis-Bacon regulation require the contractor to "insert in any subcontracts that clauses contained in 29 C.F.R. § 5.5(a)(1) through (10) [about wage determinations, proper pay and weekly payroll certifications] and such other clauses as the [federal agency] may be appropriate instructions require." 29 C.F.R. § 5.5(a)(6). "[L]aborers and mechanics shall be paid not less than the appropriate wage determination of the classification of work actually performed." 48 C.F.R. § 52.222-6(b)(3); see also 48 C.F.R. § 52.222-6(c)(4) (the wage rate and fringe benefits shall be paid "to all workers performing work in the classification").

Under the Davis-Bacon Act, contractors and subcontractors must also furnish weekly payroll certifications of wages paid to each employee for that week. 40 U.S.C. § 3145; 29 C.F.R. § 5.5(a)(3)(I) and (ii)(A)(B). Applicable regulations expressly provide that "[t]he prime contractor is responsible for the submission of copies of payrolls by all subcontractors," 29 C.F.R. § 5.5(a)(3)(ii)(A), and that the "prime contractor shall be responsible for the compliance by any subcontractor or lower tier subcontractor with all the contract clauses in 29 C.F.R. 5.5." Id. at § 5.5(a)(6). Payment of federal funds to contractors are expressly contingent upon receipt

14

of the contractors' weekly certifications of Davis-Bacon Act. 40 U.S.C. § 3142.

As the Eleventh Circuit stated in light of the Davis-Bacon Act's wage requirements and

federal regulations:

> "every contract based upon these specifications shall contain a stipulation that the
> contractor or his subcontractor shall pay all mechanics and laborers" the federally
> mandated wages. 40 U.S.C. § 276a(a) (emphasis added). [since recodified as 40
> U.S.C. § 3142]. Federal regulations applicable to contracts and subcontracts under
> the Davis-Bacon Act provide, "The prime contractor shall be responsible for the
> compliance by any subcontractor or lower tier subcontractor...."

National Fire Ins. Co. of Harford v. Fortune Const. Co., 320 F.3d 1260, 1276 (11th Cir. 2003).

In a word, the contractor "is required by law, as well as by public policy to ensure

compliance by its subcontractors with the Davis-Bacon Act," id. at 1277 n. 20, including prime

contractors. Ball, Ball & Brosamer, Inc. v. Reich, 24 F.3d 1447, 1449 n.1 (D.C. Cir. 1994) ("As

the prime contractor, Ball was equally responsible for the repayment of unpaid wages to [its

subcontractor's] workers"). The Sixth Circuit stated the necessity of strict compliance with the

Davis-Bacon Act:

> [P]arties that contract with the government are held to the letter of the contract,
> irrespective of whether the contract terms appear onerous from an ex post
> perspective, or whether the contract's purpose could be effectuated in some other
> way, under the maxim that men must turn square corners when they deal with the
> Government.

United States ex rel. Compton v Midwest Spec., Inc., 142 F.3d 296, 302 (6th Cir. 1998). This

"'squares corners' rule applies fully in the False Claims Act context." Id. at 302 n.4.

For a FCA claim, "[n]o proof of specific intent to defraud is required." 31 U.S.C. §

3729(b)(3). Under the earlier version of the FCA, Plaintiffs' proof had to show that "the

defendant intended the false record or statement be material to the Government's decision to pay

15

or approve the false claim." <u>Allison Engine Co., Inc. v. United States ex rel Sanders</u>, 128 S. Ct. 2123, 2126 (2008). This "intent" requirement refers to the defendant's awareness that its statements would potentially be relied upon by the government, not to the defendant's awareness of the truth or falsity of its statement. <u>Id.</u> at 2130 n.2 ("§ 3729(b) refers to specific intent with regard to the truth or falsity of the 'information,' while our holding refers to a defendant's purpose in making or using a false record or statement"). Congress, however, subsequently amended the FCA to overrule <u>Allison Engine</u> by removing from § 3729(a)(1)(B) the words "to get" and substitute the words "material to." As amended, § 3729(a)(1)(B) imposes liability under the FCA if a defendant "knowingly makes . . . a false record or statement that is "material to" a false or fraudulent claim," P.L. 111-21, § 4(a) (emphasis added).[3] This amendment was to "take effect as if enacted on June 7, 2008," the date of the <u>Allison Engine</u> decision, and applies to all claims under the False Claims Act. . . that are pending on or after that date. <u>Id.</u> at § 4(f)(1).

Courts differ on whether these amendments to § 3729(a)(1)(B) are retroactive. <u>Compare United States ex rel. Stephens v. Tissue Science Lab, Inc.</u>, 664 F. Supp. 2d 1310, 1316 (N.D. Ga. 2009) (amendment is retroactive) with <u>United States ex rel. Sanders v. Allison Engine Co.</u>, 667 F. Supp. 2d 747, 758 (S.D. Ohio 2009) (amendment was not retroactive). This Court does not need to decide the issue,[4] because the United States has shown that the material facts establish Circle C's FCA violations under both the amended and pre-amended version of the false statements provision. Under the former § 3729(a)(2), "the defendant must have made a false

_____

[3]Material is now defined by the FCA as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 32 U.S.C. § 3129(b)(4).

[4]<u>See</u> <u>Pearson v. Callahan</u>, 129 S. Ct. 808, 821 (2009) (deference on deciding constitutional issues unless adjudication is unavoidable).

16

statement or created a false record, and must have done so 'with 'actual knowledge,' 'deliberate ignorance,' or 'reckless disregard of the truth or falsity of the information.'" United States ex rel. SNAPP, Inc. v. Ford Motor Co., 532 F.3d 496, 505 (6th Cir. 2008); see United States ex rel. Augustine v. Century Health Servs., Inc., 289 F.3d 409, 413 (6th Cir. 2002) (discussing knowledge standard under FCA).

The false statement to the federal government must be to receive payment. SNAPP, 532 F.3d at 505. The false statement also "must have been made with the purpose of getting a false or fraudulent claim paid or approved by the Government." Id. Finally, the false statement must have been material to the government's payment decision. Id. This means that it must have a "natural tendency" to influence the decision-maker. United States ex rel. A+ Homecare, Inc. v. Medshares Mgt. Group, Inc., 400 F.3d 428, 445 (6th Cir. 2005); accord United States v. Harvard College, 323 F. Supp. 2d 151, 186 (D. Mass. 2004) (materiality is based upon whether a failure to certify could have caused government to refuse to make payments). Here, the Davis-Bacon Act and its regulations require payroll certifications for the payment of federal funds on government contracts and those laws are expressly incorporated into Circle C's contract on the Fort Campbell project. As a matter of law, "[p]ayment of federal funds to the contractors are expressly contingent upon receipt of the contractors' weekly certifications of Davis-Bacon Act compliance." In re Schimmels, 85 F.3d 416, 419 n.2 (9th Cir. 1996).

In Medshares, the Sixth Circuit adopted the implied certification theory under the FCA, "which holds a defendant liable for violating the 'continuing duty to comply with the regulations on which payments is conditioned.'" 400 F.3d at 454 n. 20; accord Augustine, 289 F.3d at 415 (a defendant "violates its continuing duty to comply with regulations on which payment is

17

conditioned"). Reckless disregard of contract provisions for payroll certifications is sufficient for FCA liability because a specific intent to defraud is not required under the FCA. See United States v. Krizek, 111 F.3d 934, 941-42 (D.C. Cir. 1997) (finding reckless disregard in submission of Medicare claims sufficient for FCA violation. In United States v. Stevens, 605 F. Supp. 2d 863, 869 (W.D. Ky. 2008) (summary judgment awarded on FCA claims against a doctor, who "failed to take any reasonable steps to ensure his billings were correct"). See United States v. Pres. & Fellows of Harvard College, 323 F.Supp.2d 151, 181 (D. Mass. 2004) (finding Harvard's certifications in FCA case to be "literally false").

Circle C's government contract required Circle C to be responsible for its subcontractor employees to be paid in the amounts listed under the Davis-Bacon Act. Circle C's contract also incorporated Davis-Bacon Act regulations that any contract require subcontractors to incorporate all regulatory requirements about payroll certifications and prevailing wages. Circle C did not have a written subcontract with Phase Tech nor ensure that Phase Tech complied with the Davis-Bacon Act. Thus, Circle C's wage certifications wrongly certified that the prevailing wages were paid on the Fort Campbell project in violation the FCA. See Harvard College, 323 F. Supp. 2d at 180-81 (finding that certifications that disbursements "were made for purposes and conditions of the grant or agreement" were false, when facts so showed). Circle C's listing of Phase Tech as a subcontractor on a document to Fort Campbell officials does not relieve Circle C of its clear payroll certifications requirements in its contract on the Fort Campbell project.

Circle C cites United States ex rel Windsor v. DynCorp, Inc., 895 F. Supp. 844, 852 (E.D. Va. 1995) that involved a FCA claim where the district court concluded that the Department of Labor possesses sole authority over employee classification disputes under the Davis-Bacon Act.

18

Yet, <u>Dyncorp</u> involved a Davis-Bacon Act "complex classification" of the jobs at issue on the FCA claim. Here, the undisputed proof is that all of Phase Tech's employees on this project performed electrical work for which Davis-Bacon Act wages were clearly defined by the contract. There are not any complex Davis-Bacon Act classification regulation in this action and <u>DynCorp</u> is inapplicable.

Here, Circle C's original payroll certifications as well as its December 2008 submission of Phase Tech's payroll certifications contained false entries. In submitting Phase Tech's December 2008 payroll certifications, Circle C also used or caused to be used the false certifications that the payrolls were complete and accurate despite clear omissions and/or inaccuracies about Phase Tech employees' wages because Circle C and/or Phase Tech did not pay the prevailing wages to all employees. In fact, the Phase Tech electrical workers and other workers were not paid the prevailing wages in Kentucky, where most of the Fort Campbell contact work occurred.

Aside from its FCA claims, the Court also concludes that the United States is also entitled to recover on its unjust enrichment claim. "The elements of a federal common law claim of unjust enrichment are: (1) the Government had a reasonable expectation of payment; (2) [the defendant] should reasonably have expected to pay; or (3) society's reasonable expectations of person and property would be defeated by nonpayment.'" <u>United States v. Rogan</u>, 459 F.Supp.2d 692, 728 (N.D. Ill. 2006) <u>aff'd</u>, 517 F.3d 449 (7th Cir. 2008) (citations omitted). Here, Circle C "is unjustly enriched [by] the retention of [a] benefit" that should have been paid to workers. Restatement of Restitution, § 1 (1937).

For the reasons discussed above, Circle C was unjustly enriched by its receipt of

contractual payments from the United States for electrical work that it was not paid in compliance with its contract's wage requirements. Given Circle C clearly failed to ensure that the subcontractor paid the Davis-Bacon wages to its workers, the United States can recover from Circle C the substantial benefits that accrued to Circle C by virtue of its non-compliance. To allow Circle C to retain the United States' payments for the electrical work at set rates would be inequitable. The unjust enrichment judgment, however, is cumulative given the award of treble damages.

Any "[d]amages awarded under the False Claims Act typically are liberally calculated to ensure that they 'afford the government complete indemnity for the injuries done it.'" Compton, 142 F.3d at 304 (6th Cir. 1997) (citation omitted). "Ordinarily the proper damages in a FCA case is the difference between what the government actually paid out by reason of the false claim over and above what it would have paid had the government known the true facts." United States v. Estate of Rogers, 2001 WL 818160, at *32 (E.D. Tenn. June 28, 2001) (doctor misappropriating someone else's Medicare number). See also United States v. Ekelman & Assoc., 532 F.2d 545, 551 (6th Cir. 1976) (finding that the government was entitled to the reasonable expenses of maintaining property that government would not have incurred but for the fraud). In United States v. Macomb Contracting Corp., this Court concluded in an FCA action involving an illegal scheme to secure a government contract by use of an ineligible subcontractor that the amount of the government's damages was the "amount of money paid to Macomb for no work on the project." 1988 U.S. Dist. LEXIS 17608, *114-15 (M.D. Tenn. Oct. 14, 1988), adopted with stated modifications in United States v. Macomb Contracting Corp., 763 F. Supp. 272 (M.D. Tenn. 1990).

Here, the undisputed fact is that the Army paid five hundred fifty-three thousand eight hundred seven dollars seventy-one cents ($553,807.71) that would not have not paid if the United States had known about Circle C's false certifications. Given the clarity of the certification and payment requirements of Circle C's contract and Circle C's history with government contracts and its wage requirements, the Court concludes that under the FCA, the United States is entitled to three times its actual damages. 31 U.S.C. § 3729(a)(7). Thus, Circle C must pay one million six hundred sixty-one thousand four hundred twenty-three dollars thirteen cents ($1,661,423.13) in treble damages to the United States.

The United States also seeks a civil penalty of five thousand five hundred dollars ($5,500) to eleven thousand dollars ($11,000) for each false claim, 31 U.S.C. § 3729(a)(7). Given the treble damages award, the Court declines to impose a civil penalty.

For the above stated reasons, the Court concludes that the United States's motion for summary judgment (Docket Entry No. 73) should be granted.

An appropriate Order if filed herewith.

**ENTERED** this the ___15th___ day of March, 2010.

WILLIAM J. HAYNES, JR.
United States District Judge

21