# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

Deborah S. Hunt
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  October 01, 2012

Mr. John Bollen Carlson
221 Rolling Fork Court
Nashville, TN 37205

Mr. Perry A. Craft
Craft & Sheppard
214 Centerview Drive, Suite 233
Brentwood, TN 37027-0000

Ms. Ellen Bowden McIntyre
United States Attorney's Office
110 Ninth Avenue, S., Suite A-961
Nashville, TN 37203

            Re:  Case No. 10-5645, *USA, ex rel., et al v. Circle C Construction, LLC, et al*
                 Originating Case No. : 07-00091

Dear Counsel,

    The court today announced its decision in the above-styled case.

    Enclosed is a copy of the court's opinion together with the judgment which has been entered
in conformity with Rule 36, Federal Rules of Appellate Procedure.

                            Yours very truly,

                            Deborah S. Hunt, Clerk


                            Cathryn Lovely
                            Deputy Clerk

cc:  Mr. Keith Throckmorton

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0351p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

UNITED STATES OF AMERICA, ex rel. BRIAN
WALL,

               *Plaintiffs-Appellees*,

      *v.*

CIRCLE C CONSTRUCTION, L.L.C.,
               *Defendant-Appellant*,

PHASE TECH, LLC,

               *Defendant*.

No. 10-5645

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 07-00091—William J. Haynes, Jr., District Judge.

Argued: January 11, 2012

Decided and Filed:  October 1, 2012

Before:  SILER and GRIFFIN, Circuit Judges; and TARNOW, District Judge.[*]

————————————

## COUNSEL

**ARGUED:** John B. Carlson, Nashville, Tennessee, for Appellants.  Ellen Bowden McIntyre, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee. **ON BRIEF:** John B. Carlson, Nashville, Tennessee, for Appellants.  Ellen Bowden McIntyre, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee.

———————————————

[*]The Honorable Arthur J. Tarnow, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

————————————

# OPINION

————————————

GRIFFIN, Circuit Judge.  In this action alleging a violation of the federal False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(2) (2006), defendant Circle C Construction, LLC ("Circle C") appeals an order of the district court denying its motions for summary judgment and to dismiss the amended complaint, and granting summary judgment in favor of plaintiffs United States of America, *ex rel*. Brian Wall ("plaintiffs") in the treble damages amount of $1,661,423.13.

We affirm the grant of summary judgment in favor of plaintiffs, but reverse the award of damages and remand for a recalculation of the damages.

## I.

The relevant underlying facts are set forth in the district court's Memorandum Opinion:

> Circle C signed an agreement with the Army to construct buildings at the Fort Campbell military base.    Circle C's agreement included determinations of hourly wages for electrical workers with a base hourly rate of $19.19, plus fringe benefits of $3.94 an hour.   Prior to this contract, Circle C has had government contracts for almost twenty (20) years.  Frances Cates, a Circle C co-owner, and Dorothy Tyndall, Circle C's bookkeeper, attended a training session at Fort Campbell on the prevailing wage requirement for federal government contracts.   In this Fort Campbell contract, Circle C acknowledged its "familiarity with" the prevailing wage requirements in all of its contracts. (Docket Entry No. 91, Defendant's Response to Plaintiffs Statement of Undisputed Facts at ¶ 11). John W. Cates, Circle C's corporate representative[,] conceded Circle C's knowledge of various Davis-Bacon Act requirements. *Id.* at ¶ 14.

> Among Circle C's contractual obligations on the Fort Campbell project were Circle C's obligations to pay electricians according to the wage determinations in the contract, to ensure that persons doing electrical work were paid as electricians; to submit payroll certifications to Fort Campbell as a condition of payment; and to ensure that its subcontractors complied with [the] Davis-Bacon Act and that the payroll certification submitted to Fort Campbell were complete and accurate, including

information on Circle C's subcontractors. Circle C conceded that it "should submit payroll certifications for all employees on the Fort Campbell project." (Docket Entry No. 75-1 at 12, Exhibit 3). Circle C submitted its payroll certifications for the original certifications, but did not list Phase Tech's employees. Circle C asserts that it never promoted itself as the prime contractor on this project. Yet, during this same period, Circle C submitted separate certified payrolls for its other subcontractors. Phase Tech did not submit any payroll certification for 2004 and 2005.

Phase Tech was Circle C's subcontractor on at least 98 percent of the electrical work on the Fort Campbell project, but did not sign a written contract with Circle C. Circle C provided Phase Tech with the wage determination excerpts from its contract, but did not discuss the Davis-Bacon Act requirements with Phase Tech nor verify whether Phase Tech submitted its own payroll certifications to Fort Campbell. Circle C did not provide a blank payroll certification form to Phase Tech. Circle C lacked a protocol or procedure to monitor Phase Tech's employees' work on the Fort Campbell project and did not take measures to ensure payment of proper wages under the Davis-Bacon Act to Phase Tech's employees. According to Charles Cooper, Phase Tech co-owner and certified electrician, Circle C did not inform Phase Tech of the need to submit certified payrolls for the Fort Campbell project until approximately 2006, two years after the project commenced.

Phase Tech had eight employees, including [Relator] Wall, who worked on the Fort Campbell contract, performed electrical and conduit work as electricians. Wall, the relator, and Ryan McPherson were Phase Tech employees on a construction project for which Circle C was the prime contractor and Phase Tech was a subcontractor. Wall also performed preparatory and finishing work for the electrical wiring on the Fort Campbell project. According to John W. Cates, Circle C's corporate representative for this project, Circle C neither supervised, directed nor paid for Wall's or McPherson's work on Fort Campbell's contract. Circle C notes that it was neither asked or requested to pay or supervise the payment of Wall or McPherson.

After this action was filed, Circle C asked Phase Tech to provide new payroll certifications for the years when Phase Tech's employees were not included on any certified payrolls. Phase Tech provided this information to Circle C in December 2008. Phase Tech's contemporaneous records include daily calendars with the names of Phase Tech employees and their assigned job sites as well as dates and times of their work. Phase Tech also has pay stubs, but not for Phase Tech employees on the Fort Campbell project. According to Cooper, Phase Tech's owner at the time that these certifications were completed,

No. 10-5645     *United States, et al. v. Circle C Constr.*     Page 4

"I'm sure I told [John W. Cates] they weren't-they weren't complete." (Docket Entry No. 75-8 at p. 50). Circle C never verified these 2008 certifications for completeness and accuracy, but submitted them to Fort Campbell officials.

Edison Gunter, Special Agent with the United States Department of Labor ("DOL") reviewed Circle C's and Phase Tech's certifications for the Fort Campbell contract as well as Phase Tech's daily calendars and pay stubs. Gunter found 62 inaccurate or false payroll certifications of which 53 were Circle C's original payroll certifications from 2004 and 2005. Despite contemporaneous records of Phase Tech employees on the project, Circle C did not list Phase Tech's employees. Of the payroll certifications Phase Tech signed and Circle C submitted in December 2008, nine (9) certifications were inaccurate because certification for Phase Tech workers did not match Phase Tech's contemporaneous documents for workers on the project.

In the December 2008 payroll certifications, Circle C listed one certified electrician for this project who was paid at the hourly wage of $12 to $16 an hour. *Id.* The wages on these certifications are below the rates on the Circle C's contract for its subcontractors' electrical workers that required a wage of $19.19 per hour, plus fringe benefits of $3.94 an hour for work in Kentucky. The pay stubs of the original 2004 and 2005 Circle C payroll certifications also reflect the workers' pay between $12 and $16 an hour. Thus, 62 payroll certifications contained non-complying hourly wages for laborers as well as an electrical worker on the payroll, with the exception of one worker who was paid about $17 an hour.

Karen Garnett, assistant district director in the DOL's Louisville Office found Circle C's original payroll certifications to be false, because Circle C knew its subcontractor Phase Tech had employees working on the contract, but failed to list those employees on its certified payrolls. According to Garnett, Circle C is also responsible for the false December 2008 certifications because Circle C was responsible for the inaccurate submissions of its subcontractor. For all certifications, Phase Tech's employees should have been categorized and paid as electricians because they performed electrical work. Garnett considered listing only one electrician with all other employees as laborers to be a red flag.

Cates and Cooper who were shown comparisons of Circle C's payroll certifications and Phase Tech's contemporaneous documents, admitted that the certifications and records were inaccurate. Cates acknowledged that the wages listed for Phase Tech employees in the certification were less that the Davis-Bacon Act requirement for electrical workers. Circle C's and Phase Tech's December 2008 certifications include the provision that certifying representative states that "I pay or supervise the payment

of the persons employed by [Circle C or Phase Tech and] that during the payroll period . . . all persons employed on said project have been paid the full weekly—the full weekly wages earned . . . [and that] any payrolls . . . are correct and complete." (Docket Entry No. 80, Gunter Declaration at pp. 3-4). The certifying agents also know that false statements in these certifications could subject the contractor or subcontractor to civil prosecution.

For this Fort Campbell project, the United States paid Circle C a total five hundred sixty-five thousand, one hundred nine dollars ninety one cents ($565,109.91) for the electrical portion of this project based upon specific delivery work orders for electrical work cites without dispute that all of Phase Tech's employees performed electrical works on this project. (Docket Entry No. 75, Plaintiff's Statement of Undisputed Facts at Exhibit 6, Cooper Deposition at p. 42). Phase Tech performed 98% of this project's electrical work that represents a total payment of five hundred fifty-three thousand eight hundred seven dollars seventy-one cents ($553,807.71), that was given to Circle C and is the actual amount that should have been paid to Phase Tech's electrical and other workers.

*United States ex rel. Wall v. Circle Constr., LLC*, 700 F. Supp. 2d 926, 930–32 (M.D. Tenn. 2010) (hereinafter the "*Wall*" decision).

## II.

On January 25, 2007, Relator Wall filed the present action on behalf of the United States, asserting a claim under the FCA against Circle C and Phase Tech. On October 29, 2007, the United States intervened in the action. On October 20, 2008, the United States moved for leave to file an amended complaint, and the district court granted the motion on October 23, 2008. The three-count amended complaint alleged: (1) a violation of the FCA, 31 U.S.C. § 3729(a)(2) (2006); (2) unjust enrichment; and (3) payment by mistake. Specifically, plaintiffs averred that all of the payroll certifications during the period when Wall and McPherson worked at the construction site were false because defendants (1) failed to disclose that any Phase Tech employees worked on the Circle C contract, and (2) the payroll certifications falsely asserted that Circle C paid the prevailing Davis-Bacon Act wages to employees, including Circle C's subcontracted employees, when this was not the case. The amended complaint further alleged that the United States believed that discovery would reveal additional false

No. 10-5645    *United States, et al. v. Circle C Constr.*    Page 6

payroll certifications as well.  On March 27, 2009, Circle C filed an answer to the amended complaint.

In May 2009, plaintiffs entered into a settlement agreement with Phase Tech, and, in June 2009, Phase Tech was voluntarily dismissed from this lawsuit.

Pertinent to the present appeal, the parties thereafter filed cross-motions for summary judgment.  One argument made by Circle C in its summary judgment motion was that, under the Davis-Bacon Act, the Department of Labor, not the district court, has primary jurisdiction over plaintiffs' claims.  Circle C also filed a motion to dismiss the amended complaint,[1] in which it objected to what it deemed the late filing of plaintiffs' amended complaint (which resulted from the Clerk's Office's mistaken refiling of the otherwise timely amended complaint).  From a substantive standpoint, Circle C also argued that plaintiffs failed to state their FCA claim with the requisite particularity called for by Fed. R. Civ. P. 9(b), and that plaintiffs made no attempt to supplement the deficient pleadings pursuant to Fed. R. Civ. P. 15(d).

On March 15, 2010, the district court issued a Memorandum Opinion and Order granting plaintiffs' motion for summary judgment and awarding a judgment against Circle C in the amount of $553,807.71, trebled per FCA requirements to $1,661,423.13.  *See Wall*, 700 F. Supp. 2d at 940.  The court denied as moot Circle C's motions for summary judgment and to dismiss the amended complaint, finding first that Circle C's motions were untimely because they were filed after the court's deadline for dispositive motions set forth in the case management order.  *Id*. at 929.  Further, despite the Clerk's Office's "technical error" in belatedly docketing and refiling plaintiffs' amended complaint, the court held that Circle C waived its right to file its motion to dismiss by filing a responsive pleading (its answer to the amended complaint) before it filed the motion.  *Id.* at 929–30.  Additionally, the court rejected Circle C's primary jurisdiction argument in its summary judgment motion, arguing that the Davis-Bacon Act precludes

---

[1] Circle C did not specify the rule that served as the basis for its motion, thus the court interpreted it as a Rule 12(b) motion in its opinion.  *See Wall*, 700 F. Supp. 2d at 930.

No. 10-5645     *United States, et al. v. Circle C Constr.*     Page 7

use of an FCA remedy where, as here, the specific issue is the amount of wages paid. *Id*. at 930.

The district court then addressed plaintiffs' motion and, as to their FCA claim, held that: (1) Circle C violated the FCA by submitting false payroll certifications to the government regarding wages for Phase Tech employees, contrary to its agreement to abide by Davis-Bacon requirements; and, (2) because Circle C did not have a written subcontract with Phase Tech and did not ensure that Phase Tech complied with the Davis-Bacon Act, its wage certifications wrongly certified that prevailing wages were paid to Phase Tech electricians working on the Fort Campbell project, in violation of the FCA. *Id*. at 939.

With regard to plaintiffs' unjust enrichment claim, the district court held that Circle C was unjustly enriched by its receipt of contractual payments from the government for electrical work by Phase Tech employees that was not paid in compliance with its contractual wage requirements, thus rendering Circle C liable to plaintiffs for the substantial benefits that accrued to it by virtue of its non-compliance. *Id*. at 939. The court held, however, that the unjust enrichment judgment was cumulative given the court's award of treble damages to plaintiffs. *Id*. at 939–40.

Regarding damages that are properly measured by determining "the difference between what the government actually paid out by reason of the false claim over and above what it would have paid had the government known the true facts," the district court found the actual damages to be $553,807.71, and trebled this amount pursuant to 31 U.S.C. § 3729(a)(7), yielding a judgment of $1,661,423.13 against Circle C. *Id.* at 940 (citations omitted). The court declined to impose the additional civil penalty sought by plaintiffs. *Id*.

On March 22, 2010, the district court entered its judgment. Circle C's subsequent motion to alter or amend the judgment was denied by the court, *Wall*, 700 F. Supp. 2d at 940–41, and Circle C filed a timely Notice of Appeal on May 20, 2010.

### III.

#### A.

We review the district court's order granting summary judgment de novo and its findings of fact for clear error. *ATC Distrib. Group, Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 705 (6th Cir. 2005). Summary judgment is proper if, viewing the facts and drawing all inferences in the light most favorable to the nonmoving party, "'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Bruederle v. Louisville Metro Gov't*, 687 F.3d 771, 776 (6th Cir. 2012) (quoting Fed. R. Civ. P. 56(a)). "A genuine issue of material fact exists when there is sufficient evidence for a trier of fact to find for the non-moving party." *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). "A 'mere scintilla' of evidence, however, is not enough for the non-moving party to withstand summary judgment." *La Quinta Corp. v. Heartland Prop., LLC*, 603 F.3d 327, 335 (6th Cir. 2010) (citing *Ciminillo*, 434 F.3d at 464). "The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." *Lee v. City of Columbus, Ohio*, 636 F.3d 245, 249 (6th Cir. 2011) (citation omitted).

#### B.

As a preliminary matter, as Circle C argues and plaintiffs concede, the district court did in fact err in finding that Circle C's motion for summary judgment was untimely filed. In its opinion, the district court stated that the deadline for filing dispositive motions was November 13, 2009. *See Wall*, 700 F. Supp. 2d at 929. However, it failed to note that it had extended that deadline "through and including November 17, 2009," when it granted Circle C's second motion for an extension of time. Circle C filed its motion for summary judgment on November 17. Thus, although Circle C's motion to dismiss the amended complaint, which was filed on January 12, 2010, was untimely, its motion for summary judgment was not. The district court therefore erred when it considered the two motions together in its analysis.

Nonetheless, this error was not prejudicial, because the district court proceeded to address the merits of all of Circle C's arguments made in its summary judgment motion, including the issue of primary jurisdiction, in ruling on plaintiffs' motion for summary judgment. In addition, the court revisited its determination of damages when it denied Circle C's motion to alter or amend judgment and reaffirmed that its original damages finding was correct. *Wall*, 700 F. Supp. 2d at 940–41. Thus, the district court's error did not preclude consideration of Circle C's arguments or affect its ultimate ruling. *Cf. United States v. Gilmore*, 282 F.3d 398, 405–06 (6th Cir. 2002) ("While lack of timeliness was part of the district court's rationale in denying Gilmore's 18 U.S.C. § 3006A motions, we need not address that issue because we find no error in the district court's denial of the motions on their merits.").

C.

Circle C raised the doctrine of primary jurisdiction as one of the grounds for summary judgment, arguing that the doctrine should be applied to an FCA claim involving the Davis-Bacon Act. The district court summarily dispatched this argument, stating "courts have rejected the argument that the Davis-Bacon Act somehow precludes use of an FCA remedy, where, as here, the specific issue is the amount of wages paid." *Wall*, 700 F. Supp. 2d at 930 (citing *Foundation for Fair Contracting, Ltd. v. G & M Eastern Contracting & Double E, LLC*, 259 F. Supp. 2d 329, 339–40 & n.9 (D. N.J. 2003); *United States ex rel. IBEW v. G.E. Chen Constr., Inc.*, 954 F. Supp. 195, 197 (N.D. Cal. 1997)). We apply de novo review to the district court's decision regarding primary jurisdiction. *United States v. Haun*, 124 F.3d 745, 747 (6th Cir. 1997).

The primary jurisdiction doctrine is a rule of judicial construction which "allows courts to refer a matter to the relevant agency whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Charvat v. Echostar Satellite, LLC*, 630 F.3d 459, 466 (6th Cir. 2010) (citation and internal quotation marks omitted); *see also Fieger v. United States Att'y Gen.*, 542 F.3d 1111, 1121 (6th Cir. 2008) ("[Under] the doctrine of primary jurisdiction, . . . federal courts are to abstain from

hearing certain administrative-related matters until the appropriate agency has had the opportunity to interpret unanswered technical and factual issues."). "When the doctrine is applicable, court proceedings are stayed so as to give the parties reasonable opportunity to 'refer' the matter to an agency seeking an administrative ruling." *Haun*, 124 F.3d at 749 (citations omitted).[2]

Courts have referred matters to agencies for a variety of reasons: "(1) to advance regulatory uniformity; (2) to answer a question . . . within the agency's discretion; and (3) to benefit from technical or policy considerations within the agency's . . . expertise." *Charvat*, 630 F.3d at 466 (citations and internal quotation marks omitted). "No ready formula controls its application; courts instead look to whether the purposes of the doctrine, including uniformity and accuracy gained through administrative expertise, will be especially furthered by invocation in the particular litigation." *Haun*, 124 F.3d at 750. Overall, in light of the federal courts' "unflagging obligation" to exercise the jurisdiction accorded them, *Haun*, 124 F.3d at 752 (citation and internal quotation marks omitted), primary jurisdiction "is limited . . . to cases where protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme." *Fieger*, 542 F.3d at 1121 (citation and internal quotation marks omitted).

Moreover, "the doctrine does not apply when the specially competent agency is itself the plaintiff," because "'deference to an agency's primary jurisdiction makes little sense in the context of an enforcement proceeding initiated by the agency.'" *United States v. Any and All Radio Station Transmission Equip.*, 204 F.3d 658, 664 (6th Cir. 2000) (quoting *United States v. Alcon Lab.*, 636 F.2d 876, 888 (1st Cir. 1981)); *see also ICC v. Maine Cent. R. Co.*, 505 F.2d 590, 594 (2d Cir. 1974); *ICC v. All-American, Inc.*, 505 F.2d 1360, 1362 (7th Cir. 1974); *CAB v. Aeromatic Travel Corp.*, 489 F.2d 251, 254 (2d Cir. 1973).

---

[2]"Unlike exhaustion, which applies when a claim is cognizable in the first instance by the agency alone, [p]rimary jurisdiction . . . applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." *Haun*, 124 F.3d at 750 (citation and internal quotation marks omitted).

No. 10-5645        *United States, et al. v. Circle C Constr.*        Page 11

The injuries and remedies under the FCA and Davis-Bacon Act are separate and distinct. *Compare* 31 U.S.C. §§ 3729, 28 C.F.R. § 85.3(a)(9) (FCA false claims, treble damages, and civil penalties, respectively), *with* 40 U.S.C. §§ 3142, 3145 and 29 C.F.R. § 5.5 (Davis-Bacon Act wage and certification requirements and remedies). However, "[c]ases brought pursuant to the [False Claims] Act under the so-called false 'certification theory' of liability necessarily implicate, to some degree, agency knowledge." *United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 340, 353 (S.D. N.Y. 2004) (footnote omitted). "This is particularly true where the gravamen of the Complaint is that defendants defrauded the Government by falsely certifying compliance with governing administrative regulations." *Id.* (footnote omitted).

Nonetheless, "'[m]ost courts that have considered the argument that a court should defer resolution of a False Claims Act case pending an agency's determination of one or more issues in the case have rejected it.'" *Id.* at 354 n.60 (quoting Claire M. Sylvia, *The False Claims Act: Fraud Against the Government* § 10:13, at 474 (2004)). *See, e.g.*, *United States ex rel. Plumbers & Steamfitters Local Union No. 38 v. Ren Constr. Co.*, 183 F.3d 1088, 1091–92 (9th Cir. 1999) ("[A] false certification that workers have been paid at the legally required wage rate may give rise to liability under the FCA. If, as the Plumbers allege, [the defendant] submitted such false certifications, it may be liable under the False Claims Act."); *United States ex rel. Plumbers & Steamfitters Local Union No. 342 v. Dan Caputo Co.*, 152 F.3d 1060, 1062 (9th Cir. 1998) (per curiam) (holding in FCA suit regarding contractors' classification of employees for purposes of the Davis-Bacon Act, that "deferral to the Department [of Labor] was proper only with respect to the resolution of how particular types of work should be classified but not with respect to whether the Contractors misclassified their employees"); *Gabelli*, 345 F. Supp. 2d at 354–57 (concluding that a determination whether the defendants acted with the requisite intent to defraud the government in violation of the FCA did not necessitate technical, agency-specific expertise; there was little danger of inconsistent rulings; and, given additional costs and lengthy delay that would result from referral to the FCC, the administration of justice weighed against application of the primary jurisdiction doctrine).

No. 10-5645          *United States, et al. v. Circle C Constr.*          Page 12

As these cases reflect, the courts have drawn a dichotomy between a contractor's misrepresentation of wages and its misclassification of workers. This dichotomy is best illustrated in *United States ex rel. Windsor v. DynCorp, Inc.*, 895 F. Supp. 844, 851–52 (E.D. Va. 1995), in which the plaintiffs brought a qui tam action against a government contractor, DynCorp, alleging that it violated the FCA when it intentionally misclassified, and consequently underpaid, certain employees. The district court granted summary judgment in favor of DynCorp, holding that "it is impossible to determine whether DynCorp submitted a false claim to the government without first determining whether DynCorp actually misclassified an employee in a given instance," and that under the governing regulations, "the responsibility for resolving such disputes rests not with the courts, but with the [DOL]." *Id.* at 851 (citing 29 C.F.R. §§ 5.5(a)(9), 5.6(a)(3), 5.6(b), 5.11(a)). However, the court was quick to point out that its ruling did not accord "blanket immunity from FCA liability" to violators of the Davis-Bacon Act:

> Where the contractor's statement may be determined to be false without regard to complex Davis-Bacon Act classification regulations, then a Davis-Bacon Act violation may form the basis of an FCA suit. That is, where the "falsity" of the false statement is not dependent on interpretation and application of those regulations, the current obstacle to FCA liability disappears. For example, if, unlike the instant situation, a contractor misrepresents the wages actually paid to its employees, or lies about the frequency with which they receive paychecks, an FCA action may be viable. In that circumstance, the jury could make a finding regarding the falsity of the false claim through standard fact[-]finding techniques, and with no intrusion into the province of the [DOL]. Accordingly, the Davis-Bacon Act by no means precludes or preempts all FCA suits for false claims that happen also to be Davis-Bacon Act violations. It is worth emphasizing in this regard that [the plaintiff] claims not that DynCorp misrepresented the amount its workers were actually paid, but rather that its classification of certain workers was erroneous. Such disputes are appropriately relegated to the [DOL].

*Id.* at 852–53 (citation and footnotes omitted); *see also Foundation for Fair Contracting, Ltd.*, 259 F. Supp. 2d at 339–41 (dismissing for lack of subject-matter jurisdiction the plaintiff's FCA qui tam action against a public contractor because the "plaintiff's suit seeks to remedy fraud that the government has already investigated within its full regulatory authority, culminating in a resolution acceptable to the DOL, based on the

same set of underlying facts," but further noting that "in an appropriate case, an FCA claim can be predicated upon a Davis-Bacon violation"); *G.E. Chen Constr., Inc*., 954 F. Supp. at 197 (citing *DynCorp* and holding that to the extent that the plaintiffs' FCA claims were based on allegations that the defendants misclassified employees, the court lacked jurisdiction to decide those claims, which were within the sole jurisdiction of the DOL; however, the court did have jurisdiction to hear the plaintiffs' additional claim that the defendants submitted false statements and prepared false payroll certifications, because those allegations did not depend on any determination of the proper classification of workers, a DOL responsibility).

In addressing plaintiffs' motion for summary judgment in the present case, the district court correctly distinguished *DynCorp* from the present circumstances, opining that the core dispute here involves misrepresentation, not misclassification:

> *DynCorp* involved a Davis-Bacon Act "complex classification" of the jobs at issue on the FCA claim. Here, the undisputed proof is that all of Phase Tech's employees on this project performed electrical work for which Davis-Bacon Act wages were clearly defined by the contract. There are not any complex Davis-Bacon classification regulation[s] in this action and *DynCorp* is inapplicable.

*Wall*, 700 F. Supp. 2d at 939.

We agree with the district court that the doctrine of primary jurisdiction does not foreclose plaintiffs' FCA suit alleging Davis-Bacon Act violations where, as here, the government was not aware of the conduct at issue until after Wall filed his complaint, and thus did not deliberately bypass administrative procedures; the determination whether Circle C acted with the requisite intent to defraud the government in violation of the FCA does not necessitate technical, agency specific expertise; and the regulations explicitly provide that the falsification of payroll certifications may subject the contractor to civil prosecution under the FCA. Plaintiffs allege violations of the FCA under a false certification theory; this is not a dispute over how a particular type of work should be classified for purposes of wage determinations. Accordingly, deferral to the

No. 10-5645          *United States, et al. v. Circle C Constr.*          Page 14

DOL was not warranted, and the district court properly declined to refer the case to the DOL pursuant to the primary jurisdiction doctrine.

### D.

The Davis-Bacon Act requires that government contractors pay the prevailing wages set by the Secretary of Labor to employees working on government projects, 40 U.S.C. § 3142, with the underlying dual purpose being to "give local laborers and contractors fair opportunity to participate in building programs when federal money is involved and to protect local wage standards by preventing contractors from basing their bids on wages lower than those in the prevailing area." *L.P. Cavett Co. v. U.S. Dep't of Labor*, 101 F.3d 1111, 1113 (6th Cir. 1996). Government contracts must contain stipulations that the contractor or subcontractor shall pay its employees the wage determinations listed in the contract, 40 U.S.C. § 3142(c), and "insert in any subcontracts the clauses contained in 29 C.F.R. § 5.5(a)(1) through (10) [regarding wage determinations and payroll certifications] and such other clauses as the [federal agency] may by appropriate instructions require." 29 C.F.R. § 5.5(a)(6). Laborers "shall be paid not less than the appropriate wage rate and fringe benefits in the wage determination for the classification of work actually performed[.]" 48 C.F.R. § 52.222-6(b)(3); *see also* 48 C.F.R. § 52.222-6(c)(4).

In addition, contractors and subcontractors must furnish weekly wage payroll certifications pertaining to each employee, and prime contractors are responsible for submitting copies of payrolls by all subcontractors and ensuring compliance by subcontractors. 40 U.S.C. § 3145(a); 29 C.F.R. §§ 5.5(a)(3)(ii)(A), (a)(6); *Nat'l Fire Ins. Co. of Hartford v. Fortune Constr. Co.*, 320 F.3d 1260, 1276–77 (11th Cir. 2003). The payment of federal funds is contingent upon the receipt of the contractors' weekly certifications. 40 U.S.C. § 3142. Pursuant to these regulations, "parties that contract with the government are held to the letter of the contract[.]" *United States ex rel. Compton v. Midwest Specialties, Inc*., 142 F.3d 296, 302 (6th Cir. 1998).

In their amended complaint, plaintiffs alleged that Circle C violated 31 U.S.C. § 3729(a)(2) (2006), the version of the FCA then in effect.[3]  Subsection (a)(2) imposes civil liability when a person "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."  31 U.S.C. § 3729(a)(2) (2006).  A cause of action brought pursuant to this subsection requires proof of several elements:

> (1) that the defendant make a false statement or create a false record with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the information; (2) that the defendant have submitted a claim for payment to the federal government; (3) that the defendant's false statement have been made with the purpose  of getting a false or fraudulent claim paid or approved by the Government; and (4) that the false statement or record have been material to the Government's decision to make the payment sought in the defendant's claim.

*SNAPP*, 618 F.3d 505, 509 (6th Cir. 2010) (citation omitted).

"[N]o proof of specific intent to defraud is required" for an FCA claim. 31 U.S.C. § 3729(b)(3) (2006) [now 31 U.S.C. § 3729(b)(1)(B)]. "[A]n aggravated form of gross negligence (i.e., reckless disregard) will satisfy the scienter requirement for an

---

[3]As the district court accurately noted, subsection 3729(a)(2) was revised and recodified in 2009, when Congress enacted the Fraud Enforcement Recovery Act ("FERA").  *See* Pub. L. No. 111-21, § 4, 123 Stat. 1617 (2009).  In its new form, it punishes any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B).  Congress amended this portion of the FCA to legislatively overrule *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662 (2008), in which the Supreme Court held that "[w]hat § 3729(a)(2) demands is not proof that the defendant caused a false record or statement to be presented or submitted to the Government but that the defendant made a false record or statement for the purpose of getting 'a false or fraudulent claim paid or approved by the Government.'" *Id.* at 671.  *Allison* "addressed the possibility that, rather than presenting a claim to the government itself, a defendant might instead be a subcontractor who 'submits a false statement to the prime contractor intending for the statement to be used by the prime contractor to get the Government to pay its claim.'" *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 473 (6th Cir. 2011) (quoting *Allison*, 553 U.S. at 671).  Congress replaced the words "to get" in the former version with "material to," thereby eliminating this intent requirement.  *See generally Chesbrough*, 655 F.3d at 466 n.2; *United States v. United Tech. Corp.*, 626 F.3d 313, 321 (6th Cir. 2010); *SNAPP, Inc. v. Ford Motor Co.*, 618 F.3d 505, 509 n.2 (6th Cir. 2010).

The issue of the statute's retroactive application is still "unsettled," *SNAPP*, 618 F.3d at 509 n.2, and is currently pending in this court (*see Sanders v. Allison Engine Co., Inc.*, Docket Nos. 10-3818 and 10-3821).  The district court in the present case did not rule on the issue of retroactivity because it found that the plaintiffs had shown violations pursuant to the standards of both the pre- and post-amended versions of § 3729.  *See Wall*, 700 F. Supp. 2d at 938.  Although the primary concern raised in *Allison* regarding subcontractors' indirect submissions is not implicated here, we agree with the district court that summary judgment in favor of plaintiffs is supported by the record when measured by either the former or amended requirements of § 3729.

No. 10-5645       *United States, et al. v. Circle C Constr.*          Page 16

FCA violation." *United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 945 n.12 (10th Cir. 2008). For purposes of the FCA, "'a false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" *United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc.*, 400 F.3d 428, 445 (6th Cir. 2005) (quoting *Neder v. United States*, 527 U.S. 1, 16 (2005)).

Circle C argues that the district court erred in holding that plaintiffs sufficiently demonstrated the essential elements of an FCA claim—falsity, knowledge, and materiality—and that there was no dispute of material fact with regard to these elements. We disagree.

A false statement can be shown to have been made by an express false certification, or through the so-called "implied certification" theory, which "holds a defendant liable for violating the 'continuing duty to comply with the regulations on which payment is conditioned.'" *A+ Homecare*, 400 F.3d at 454 n.20 (quoting *United States ex rel. Augustine v. Century Health Servs., Inc.*, 289 F.3d 409, 415 (6th Cir. 2002)). Here, liability is established by the express false certifications that were made.

Circle C's contract explicitly incorporated the Davis-Bacon requirements and included an hourly wage determination for electrical workers, setting a base hourly rate of $19.19, plus $3.94 in fringe benefits. Circle C, as a frequent contractor with the government, admitted its familiarity with these requirements and acknowledged that Frances Cates and Dorothy Tyndall attended a training session conducted by the Fort Campbell Contracting Office regarding Davis-Bacon prevailing wage requirements. Circle C conceded that it should submit payroll certifications for all employees on the project, but did not include Phase Tech employees on the original certifications, although it did submit separate payroll certifications for the other subcontractors. Circle C acknowledged that it never paid or supervised the payment of any Phase Tech employees and had no first-hand knowledge regarding Phase Tech's payments to its employees. It was only in 2006 that Circle C finally informed Phase Tech of the need to submit payroll certifications to Fort Campbell. Once the records were provided by Phase Tech, Circle

C never verified their accuracy.  In fact, as established in Edison Gunter's (Special Agent with the DOL) Declaration, with attached exhibits and charts showing all of Circle C's pertinent payroll certifications, there were 62 inaccurate submissions, 53 of which pertained to 2004 and 2005 and failed to list any Phase Tech workers.  The 62 certifications also were false because they wrongly certified that the prevailing wages were paid.

Based upon this evidence, the district court did not err in finding that Circle C's original and 2008 payroll certifications at issue were expressly false because (1) they stated that they were complete, when in fact no Phase Tech employees who worked on the project were listed, and (2) the certifications wrongly represented that the prevailing wages were paid to its subcontracted employees.  *Wall*, 700 F. Supp. 2d at 939.  *See United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 116 (2d Cir. 2010), *rev'd on other grounds*, 131 S. Ct. 1885 (2011) (holding that the relator stated an FCA claim where the contractor "filed false . . . reports, necessarily knowing that they were false because [it] in fact had no mechanism in place to identify covered [individuals]. It did so in order to procure contracts and obtain payment under existing contracts, as it could do neither without filing the reports.").

As plaintiffs argue, Circle C's reliance upon *United States v. Southland Mgmt. Corp.*, 326 F.3d 669 (5th Cir. 2003) (en banc) is misplaced.  In *Southland*, the court held that the owners of an apartment complex did not make "false claims" under the FCA in their housing assistance payment vouchers attesting to safe and sanitary housing conditions, because the vouchers were submitted to HUD during a corrective action period following HUD's notification of safety deficiencies, and the owners were contractually entitled to the money until they failed to take corrective action following notification. *Id*. at 676–77.  In the present case, there are no similar contract provisions, and the DOL was not aware of potential FCA violations until after Wall filed his complaint.

Circle C also argues that nine false payroll certifications submitted in December 2008 were not properly before the district court because the amended complaint was

No. 10-5645        *United States, et al. v. Circle C Constr.*        Page 18

filed only two months beforehand, and the allegations in the complaint as to these certifications were not pled with particularity. This argument was originally advanced in Circle C's motion to dismiss the amended complaint, and thus is foreclosed due to the untimely filing of that motion.

For the reasons stated by the district court, the totality of the circumstances show that Circle C, an experienced contractor, made false statements, acted in reckless disregard of the truth or falsity of the information, and that the false statements were "material" to the government's decision to make the payment sought in Circle C's claim. Thus, we affirm the district court's grant of summary judgment in favor of plaintiffs on their FCA claim.

### E.

With regard to plaintiffs' unjust enrichment claim, Circle C contends for the first time on appeal that summary judgment was improperly granted because "the receipt of gain is not unjust enrichment to the extent that it is generated by someone's rightful contribution of effort, capital or skill." *See* Circle C's Brief at 47 (quoting *State of Tennessee v. Dole*, 749 F.2d 331, 337 (6th Cir. 1984)). However, this specific argument was not raised in the district court and therefore is not properly before this court. *Smith v. County of Lenawee*, 600 F.3d 686, 690 n.3 (6th Cir. 2010).

### IV.

Finally, Circle C appeals the treble damages award of $1,661,423.13, based upon a finding of actual damages in the amount of $553,807.71.

Circle C argues that the district court's determination that plaintiffs sustained $553,807.71 in actual damages is based upon the speculative testimony of Jeanne Shykes that for delivery orders 6 through 12, 14, and 15, the government paid Circle C $3,767,399.41, and that of this total award amount, approximately fifteen percent—or $565,109.91—was for electrical work; and assuming that Phase Tech did 98% of the electrical work on the contract, it would amount to a total of $553,807.71 in Fort Campbell funds that were affected. According to Circle C, counsel for the government

No. 10-5645        *United States, et al. v. Circle C Constr.*        Page 19

knew from discovery that the actual figure paid to Phase Tech for work on the above orders was $124,901.81.

Moreover, Circle C emphasizes that only seven of the nine delivery orders involved buildings erected in Kentucky; the other two deliveries were performed in Tennessee. Because the amended complaint only alleged the failure to pay the prevailing wage for an electrician for work performed in Kentucky, two of the delivery orders should not have been included in any calculation of payments made to Phase Tech for work performed by misclassified employees.

Finally, Circle C asserts that it is speculative to assume, as Shykes did in her Declaration, that if the government had investigated the Wall and McPherson misclassification claims, which it did not do at any time during the construction project, it would have withheld $553,807.71 from Circle C and that Circle C then would have continued with the construction project. According to Circle C, a timely investigation would have resolved the dispute and determined if, in fact, McPherson and Wall had been paid the prevailing wage, and, if not, it would have resulted in payment of that wage to them. We agree with Circle C that there are deficiencies in the district court's calculation of damages that require a remand for recalculation of those damages in this instance.

The FCA provides that violators are subject to a civil penalty of between $5,000 and $10,000, plus three times the government's actual damages. 31 U.S.C. § 3729(a). "Under the False Claims Act, the government may recover 'actual damages,' the difference between what it paid and what it should have paid for the goods." *United Tech. Corp.*, 626 F.3d at 321 (citations omitted). "Damages awarded under the [FCA] typically are liberally calculated to ensure that they afford the government complete indemnity for the injuries done it." *Compton* 142 F.3d at 304 (citation and internal quotation marks omitted). "[T]he government is entitled to full damages where it proves it received no value at all." *Id.* (citation omitted).

The damages award of $1,661,423.13 (trebled from actual damages of $553,807.71) rendered by the district court and later confirmed in its Order denying

No. 10-5645        *United States, et al. v. Circle C Constr.*        Page 20

Circle C's motion to alter or amend judgment is based upon the Declaration of Jeanne Shykes, Supervisory Contract Specialist at the Directorate of Contracting at the Fort Campbell Army Post. In that capacity, she administered construction and service contracts awarded by her office. In her Declaration, she stated:

> I was requested to provide information relevant to *United States ex rel. Brian Wall v. Circle C Construction, LLC*. Fort Campbell has paid Circle C a total of $22,466,493.24 under contract DABK09-03-D-0003. This amount was for all of the delivery orders on this contract construction of Pre-Engineered Steel Building.
>
> For the specific delivery orders 6 through 12, and 14 and 15 on this contract—which I understand are the delivery orders at issue in this case—Fort Campbell paid Circle C a total of $3,767,399.41. Of this total award amount, approximately 15%—or $565,109.91—was for electrical work. Assuming that the electrical subcontractor at issue in this case did 98% of the electrical work on the contract, that would amount to a total of $553,807.71 in Fort Campbell funds that were affected. For these same delivery orders, seven of the nine delivery orders were performed in Kentucky. The two other delivery orders were performed in Tennessee.

Shykes further explained in her Declaration that the Contracting Office did not suspect that inaccurate or false payrolls had been submitted at the time of performance, and if it had known at the time that Circle C was not properly reporting its payrolls, it would not have paid Circle C for the electrical portion of the work on the relevant delivery orders until the issue was resolved, i.e., it would not have paid $553,807.71 to Circle C. Based on her Declaration, the district court held that "the undisputed fact is that the Army paid [$553,807.71] that would not have been paid if the United States had known about Circle C's false certifications." *Wall*, 700 F. Supp. 2d at 940.

However, in its response to interrogatories, Circle C stated that it paid Phase Tech the following amounts on the delivery orders relevant to this case:

> $13,000 on delivery order number 6
> $12,200 on delivery order number 7
> $8,800 on delivery order number 8
> $13,898.77 on delivery order number 9
> $13,900 on delivery order number 10

$1,672 on delivery order number 11
$15,842.08 on delivery order number 12
$15,625.89 on delivery order number 14
$16,635.07 on delivery order number 15

These payments add up to a total of $111,573.81,[4] which obviously would have been higher if Circle C and its subcontractor had paid the proper Davis-Bacon Act wages. In other words, Circle C made higher profits by accepting full payment from the government for paying Davis-Bacon Act wages, when it was not in fact paying, either directly or indirectly through the subcontractor, the requisite wages.

Following our review, we conclude that Shykes' estimation, which is lacking in detail, does not adequately account for the discrepancy in the relevant sums presented by the parties or accurately represent the difference between what the government actually paid to Circle C and the payments to which Circle C would have been entitled in the absence of its fraud. Indeed, it is impossible to discern precisely how Shykes arrived at her total, without further data. Moreover, as Circle C argues, Shykes' estimation includes two projects that were not performed in Kentucky and therefore, consistent with the pleadings in the amended complaint, should not have been included in the calculation of payments made to Phase Tech for work performed by the misclassified employees. For these reasons, we reverse the district court's damages award and remand for a recalculation of damages.

V.

In summary, we affirm the district court's judgment with regard to liability, but reverse the award of damages and remand for a recalculation of the damages and further proceedings.

---

[4] Circle C computes a sum of $124,901.81.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 10-5645

```
┌─────────────────────────────┐
│           FILED             │
│       Oct 01, 2012          │
│   DEBORAH S. HUNT, Clerk    │
└─────────────────────────────┘
```

UNITED STATE OF AMERICA,
ex rel. BRIAN WALL,
         Plaintiffs - Appellees,

    v.

CIRCLE C CONSTRUCTION, L.L.C.,
         Defendant - Appellant,

PHASE TECH, LLC,
         Defendant.

Before: SILER and GRIFFIN, Circuit Judges; TARNOW, District Judge.

**JUDGMENT**

On Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION WHEREOF, it is ORDERED that the district court's judgment with regard to liability is AFFIRMED.  IT IS FURTHER ORDERED that the award of damages is REVERSED, and the case is REMANDED for recalculation of damages and further proceedings.

**ENTERED BY ORDER OF THE COURT**

_____

Deborah S. Hunt, Clerk