# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| *ex rel*. **BRIAN WALL,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **No. 3:07-cv-91** |
| | ) | |
| **v.** | ) | **Judge Sharp** |
| | ) | |
| **CIRCLE C CONSTRUCTION, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM</u>

Relator Brian Wall brought this action in January 2007 alleging that Circle C

Construction, LLC violated the federal False Claims Act (FCA), 31 U.S.C. § 3729(a)(2).

(Docket No. 1).  Wall claimed that Circle C knowingly submitted payroll certifications to the

Department of the Army that falsely stated that the company met the requirements of the Davis-

Bacon Act when it constructed buildings at the Fort Campbell military facility.  The United

States intervened in the action in October of that year.  (Docket No. 9).  On March 15, 2010,

Judge Haynes granted summary judgment in favor of Wall and the United States, and awarded

damages against Circle C in the amount of $553,807.71, trebled according to the FCA's

requirements to $1,661,423.13.  *See generally United States ex rel. Wall v. Circle [C] Const.,*

*LLC*, 700 F. Supp. 2d 926 (M.D. Tenn. 2010) (*Wall I*).

Circle C appealed the liability and damages determinations.  (Docket No. 121).  The

government and Wall cross-appealed a single issue related to Judge Haynes's refusal to award

civil penalties, (Docket No. 125), but voluntarily dismissed that cross-appeal days later, (Docket

No. 129).  In October 2012, the Sixth Circuit affirmed the grant of summary judgment in favor of

Plaintiffs, but reversed the damages award and remanded the case for the district court to

recalculate damages.  *See generally United States ex rel. Wall v. Circle C Const., L.L.C.*, 697 F.3d 345 (6th Cir. 2012) (*Wall II*).

The matter came before this Court after Judge Haynes declared a mistrial and recused himself following an unfinished three-day damages trial.  (Docket No. 233).  This Court held a subsequent bench trial on damages on March 18–21, 2014.  After trial, the parties filed proposed findings of fact and conclusions of law.

Having reviewed those filings, the parties' arguments, the record, and the exhibits received in evidence, and after considering the testimony of the witnesses, their interests, and their demeanor, the Court enters the following findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.  Except where the Court discusses different testimony on a specific issue, contrary testimony on a specific matter has been rejected in favor of the specific fact found.  Further, the Court omits from its recitation facts immaterial to the issues presented.  Finally, to the extent a finding of fact constitutes a conclusion of law, the Court so concludes; to the extent that a conclusion of law constitutes a finding of fact, the Court so finds.  For the reasons that follow, the Court will award Plaintiffs $762,894.54 in damages.

## **BACKGROUND**

Before reaching the core matter of Plaintiffs' damages, the Court will review the relevant background of the case as it has unfolded over the past seven years.  *Wall II* quoted at length the facts set forth in *Wall I*:

> Circle C signed an agreement with the Army to construct buildings at the Fort Campbell military base.  Circle C's agreement included determinations of hourly wages for electrical workers with a base hourly rate of $19.19, plus fringe benefits of $3.94 an hour.  Prior to this contract, Circle C has had government contracts for almost twenty (20) years.  Frances Cates, a Circle C co-owner, and Dorothy

2

Tyndall, Circle C's bookkeeper, attended a training session at Fort Campbell on the prevailing wage requirement for federal government contracts. In this Fort Campbell contract, Circle C acknowledged its "familiarity with" the prevailing wage requirements in all of its contracts. John W. Cates, Circle C's corporate representative, conceded Circle C's knowledge of various Davis-Bacon Act requirements.

Among Circle C's contractual obligations on the Fort Campbell project were Circle C's obligations to pay electricians according to the wage determinations in the contract[;] to ensure that persons doing electrical work were paid as electricians; to submit payroll certifications to Fort Campbell as a condition of payment; and to ensure that its subcontractors complied with the Davis-Bacon Act and that the payroll certification submitted to Fort Campbell were complete and accurate, including information on Circle C's subcontractors. Circle C conceded that it "should submit payroll certifications for all employees on the Fort Campbell project." Circle C submitted its payroll certifications for the original certifications, but did not list Phase Tech's employees. Circle C asserts that it never promoted itself as the prime contractor on this project. Yet, during this same period, Circle C submitted separate certified payrolls for its other subcontractors. Phase Tech did not submit any payroll certification for 2004 and 2005.

Phase Tech was Circle C's subcontractor on at least 98 percent of the electrical work on the Fort Campbell project, but did not sign a written contract with Circle C. Circle C provided Phase Tech with the wage determination excerpts from its contract, but did not discuss the Davis-Bacon Act requirements with Phase Tech nor verify whether Phase Tech submitted its own payroll certifications to Fort Campbell. Circle C did not provide a blank payroll certification form to Phase Tech. Circle C lacked a protocol or procedure to monitor Phase Tech's employees' work on the Fort Campbell project and did not take measures to ensure payment of proper wages under the Davis-Bacon Act to Phase Tech's employees. According to Charles Cooper, Phase Tech co-owner and [a] certified electrician, Circle C did not inform Phase Tech of the need to submit certified payrolls for the Fort Campbell project until approximately 2006, two years after the project commenced.

Phase Tech had eight employees, including Relator Wall, who worked on the Fort Campbell contract, performed electrical and conduit work as electricians. Wall, the relator, and Ryan McPherson were Phase Tech employees on a construction project for which Circle C was the prime contractor and Phase Tech was a subcontractor. Wall also performed preparatory and finishing work for the electrical wiring on the Fort Campbell project. According to John W. Cates, Circle C's corporate representative for this project, Circle C neither supervised, directed nor paid for Wall's or McPherson's work on Fort Campbell's contract. Circle C notes that it was neither asked or requested to pay or supervise the payment of Wall or McPherson.

After this action was filed, Circle C asked Phase Tech to provide new payroll certifications for the years when Phase Tech's employees were not included on

any certified payrolls. Phase Tech provided this information to Circle C in December 2008. Phase Tech's contemporaneous records include daily calendars with the names of Phase Tech employees and their assigned job sites as well as dates and times of their work. Phase Tech also has pay stubs, but not for Phase Tech employees on the Fort Campbell project. According to Cooper, Phase Tech's owner at the time that these certifications were completed, "I'm sure I told John W. Cates they weren't—they weren't complete." Circle C never verified these 2008 certifications for completeness and accuracy, but submitted them to Fort Campbell officials.

Edison Gunter, Special Agent with the United States Department of Labor ("DOL") reviewed Circle C's and Phase Tech's certifications for the Fort Campbell contract as well as Phase Tech's daily calendars and pay stubs. Gunter found 62 inaccurate or false payroll certifications of which 53 were Circle C's original payroll certifications from 2004 and 2005. Despite contemporaneous records of Phase Tech employees on the project, Circle C did not list Phase Tech's employees. Of the payroll certifications Phase Tech signed and Circle C submitted in December 2008, nine (9) certifications were inaccurate because certification for Phase Tech workers did not match Phase Tech's contemporaneous documents for workers on the project.

In the December 2008 payroll certifications, Circle C listed one certified electrician for this project who was paid at the hourly wage of $12 to $16 an hour. The wages on these certifications are below the rates on the Circle C's contract for its subcontractors' electrical workers that required a wage of $19.19 per hour, plus fringe benefits of $3.94 an hour for work in Kentucky. The pay stubs of the original 2004 and 2005 Circle C payroll certifications also reflect the workers' pay between $12 and $16 an hour. Thus, 62 payroll certifications contained non-complying hourly wages for laborers as well as an electrical worker on the payroll, with the exception of one worker who was paid about $17 an hour.

Karen Garnett, assistant district director in the DOL's Louisville Office found Circle C's original payroll certifications to be false, because Circle C knew its subcontractor Phase Tech had employees working on the contract, but failed to list those employees on its certified payrolls. According to Garnett, Circle C is also responsible for the false December 2008 certifications because Circle C was responsible for the inaccurate submissions of its subcontractor. For all certifications, Phase Tech's employees should have been categorized and paid as electricians because they performed electrical work. Garnett considered listing only one electrician with all other employees as laborers to be a red flag.

Cates and Cooper[,] who were shown comparisons of Circle C's payroll certifications and Phase Tech's contemporaneous documents, admitted that the certifications and records were inaccurate. Cates acknowledged that the wages listed for Phase Tech employees in the certification were less tha[n] the Davis-Bacon Act requirement for electrical workers. Circle C's and Phase Tech's December 2008 certifications include the provision that [the] certifying representative states that "I pay or supervise the payment of the persons employed by Circle C or Phase Tech and that during the payroll period . . . all persons

employed on said project have been paid the full weekly—the full weekly wages earned . . . and that any payrolls . . . are correct and complete." The certifying agents also know that false statements in these certifications could subject the contractor or subcontractor to civil prosecution.

For this Fort Campbell project, the United States paid Circle C a total five hundred sixty-five thousand, one hundred nine dollars ninety one cents ($565,109.91) for the electrical portion of this project based upon specific delivery work orders for electrical work . . . . Phase Tech performed 98% of this project's electrical work that represents a total payment of five hundred fifty-three thousand eight hundred seven dollars seventy-one cents ($553,807.71), that was given to Circle C and is the actual amount that should have been paid to Phase Tech's electrical and other workers.

*Wall II*, 697 F.3d at 346–49 (quoting *Wall I*, 700 F. Supp. 2d at 930–32) (brackets and record citations omitted; final ellipsis added).

Judge Haynes held that Circle C's payroll certifications ran afoul of the FCA in two ways:

(1) Circle C violated the FCA by submitting false payroll certifications to the government regarding wages for Phase Tech employees, contrary to its agreement to abide by Davis-Bacon requirements; and, (2) because Circle C did not have a written subcontract with Phase Tech and did not ensure that Phase Tech complied with the Davis-Bacon Act, its wage certifications wrongly certified that prevailing wages were paid to Phase Tech electricians working on the Fort Campbell project, in violation of the FCA.

*Id.* at 350 (citing *Wall I*, 700 F. Supp. 2d at 939). The Sixth Circuit affirmed these holdings, concluding that

the district court did not err in finding that Circle C's original and 2008 payroll certifications at issue were expressly false because (1) they stated that they were complete, when in fact no Phase Tech employees who worked on the project were listed, and (2) the certifications wrongly represented that the prevailing wages were paid to its subcontracted employees.

. . .

[T]he totality of the circumstances show that Circle C, an experienced contractor, made false statements, acted in reckless disregard of the truth or falsity of the information, and that the false statements were "material" to the government's decision to make the payment sought in Circle C's claim. Thus, we affirm the

district court's grant of summary judgment in favor of plaintiffs on their FCA
claim.

*Id*. at 357 (citing *Wall I*, 700 F. Supp. 2d at 939).

Although Judge Haynes's liability analysis was correct, *Wall II* disagreed with his
damages determination. Specifically, Judge Haynes said it was an "undisputed fact" that the
Army paid $553,807.71 "that would not have not paid if the United States had known about
Circle C's false certifications." *Wall I*, 700 F. Supp. 2d at 940. Judge Haynes concluded this
after finding that the United States paid Circle C $565,109.91 for electrical work on the delivery
orders at issue and that Phase Tech did 98% of the electrical work on the buildings Circle C
constructed (which works out to $553,807.71). The opinion, however, did not sufficiently detail
the evidence on which these findings rested. *Id*. at 932.

The Sixth Circuit reviewed the record and determined that the $553,807.71 figure was
based on the Declaration of Jeanne Shykes, a Supervisory Contract Specialist at the Directorate
of Contracting at Fort Campbell who administered the construction and service contracts her
office awarded. *Wall II* first quoted and then described the relevance of Shykes's Declaration:

> I was requested to provide information relevant to *United States ex*
> *rel. Brian Wall v. Circle C Construction, LLC*. Fort Campbell has
> paid Circle C a total of $22,466,493.24 under contract DABK09-
> 03-D-0003. This amount was for all of the delivery orders on this
> contract construction of Pre–Engineered Steel Building.
>
> For the specific delivery orders 6 through 12, and 14 and 15 on this
> contract—which I understand are the delivery orders at issue in
> this case—Fort Campbell paid Circle C a total of $3,767,399.41.
> Of this total award amount, approximately 15%—or
> $565,109.91—was for electrical work. Assuming that the
> electrical subcontractor at issue in this case did 98% of the
> electrical work on the contract, that would amount to a total of
> $553,807.71 in Fort Campbell funds that were affected. For these
> same delivery orders, seven of the nine delivery orders were
> performed in Kentucky. The two other delivery orders were
> performed in Tennessee.

6

Shykes further explained in her Declaration that the Contracting Office did not suspect that inaccurate or false payrolls had been submitted at the time of performance, and if it had known at the time that Circle C was not properly reporting its payrolls, it would not have paid Circle C for the electrical portion of the work on the relevant delivery orders until the issue was resolved, i.e., it would not have paid $553,807.71 to Circle C. Based on her Declaration, the district court held that "the undisputed fact is that the Army paid $553,807.71 that would not have been paid if the United States had known about Circle C's false certifications." *Wall [I]*, 700 F. Supp. 2d at 940.

*Wall II*, 697 F.3d at 358–59 (brackets omitted). The $553,807.71 figure, however, was not

"undisputed." As the Sixth Circuit explained:

> [I]n its response to interrogatories, Circle C stated that it paid Phase Tech the following amounts on the delivery orders relevant to this case:
>
> $13,000 on delivery order number 6
>
> $12,200 on delivery order number 7
>
> $8,800 on delivery order number 8
>
> $13,898.77 on delivery order number 9
>
> $13,900 on delivery order number 10
>
> $1,672 on delivery order number 11
>
> $15,842.08 on delivery order number 12
>
> $15,625.89 on delivery order number 14
>
> $16,635.07 on delivery order number 15
>
> These payments add up to a total of $111,573.81, which obviously would have been higher if Circle C and its subcontractor had paid the proper Davis-Bacon Act wages. In other words, Circle C made higher profits by accepting full payment from the government for paying Davis-Bacon Act wages, when it was not in fact paying, either directly or indirectly through the subcontractor, the requisite wages.

*Id.* at 359 (footnote omitted). As a consequence of that disputed damages evidence, the Sixth

Circuit identified two issues for the district court to consider on remand. With respect to the

first, *Wall II*

> conclude[d] that Shykes' estimation, which is lacking in detail, does not adequately account for the discrepancy in the relevant sums presented by the

parties or accurately represent the difference between what the government actually paid to Circle C and the payments to which Circle C would have been entitled in the absence of its fraud. Indeed, it is impossible to discern precisely how Shykes arrived at her total, without further data.

*Id.*[1] As to the second issue, the Sixth Circuit determined that "Shykes' estimation includes two projects that were not performed in Kentucky and therefore, consistent with the pleadings in the amended complaint, should not have been included in the calculation of payments made to Phase Tech for work performed by the misclassified employees." *Id.*

These two issues define the scope of the limited remand. With that background laid out, the Court moves on to find the facts relevant to the government's damages.

## FINDINGS OF FACT

The fixed-price requirements contract between Circle C and the Army at issue in this case was for the construction of pre-engineered warehouse and motor-pool buildings used for storage and motor-vehicle repairs. (Docket No. 304 at 157). Under its terms, Fort Campbell agreed at the outset to pay Circle C a fixed price for a lengthy list of items needed to construct each building. (The fixed-price aspect of this contract makes it distinct from a time-and-materials contract, in which the government pays the contractor for labor at a negotiated rate, as well as the

---

[1] This Court has wrestled with the proper way to understand the phrase "in the absence of its fraud" in the Sixth Circuit's opinion. In the end, the Court concludes it is a scrivener's error. As written, the two numbers for comparison—first, what the government actually paid to Circle C and, second, the payments Circle C would have been entitled to in the absence of its fraud—are the same. What the government actually paid to Circle C is payment in full; what Circle C would have been entitled to *absent* its fraud— that is, if it had not submitted false payroll certifications—is similarly payment in full. *Wall II*'s citation to the correct damages standard on the preceding page of the opinion bolsters the Court's view. 697 F.3d at 358 ("Under the False Claims Act, the government may recover actual damages, the difference between what it paid and what it should have paid for the goods.") (quoting *United States v. United Techs. Corp.*, 626 F.3d 313, 321) (internal quotation marks omitted). As well, both Circle C and the government appear to agree that the "in the absence of its fraud" formulation cannot be understood without further refinement. (Docket Nos. 304 at 12–14; 307 at 26). The most sensible construction from the Court's perspective, then, is to compare what the government actually paid to Circle C, on the one hand, and the payments Circle C would have been entitled to given the fraud, on the other.

contractor's actual cost of materials. (Docket No. 304 at 156).) Fort Campbell then would place delivery orders with Circle C as it needed new buildings. (*Id*. at 153–54, 157–58). Each delivery order equated to one building. (*Id*. at 158).

Circle C's contract contained two groups of provisions relevant to Circle C's liability in this matter. The first related to the requirements of the Davis-Bacon Act and payment of Davis-Bacon Act wage rates. The contract incorporated by reference a section of the Federal Acquisition Regulations (FAR) that states that "[a]ll laborers and mechanics employed . . . will be paid . . . the full amount of wages and bona fide fringe benefits (or cash equivalents thereof) . . . computed at rates not less than those contained in the wage determination of the Secretary of Labor which is attached hereto and made a part hereof." (Docket No. 42-2 at 106 (Pls. Ex. 1) (incorporating by reference 48 C.F.R. § 52.222-6)). The contract further elaborated the hourly wage and fringe-benefit rates for numerous job classifications particular to the project type and location. (Docket No. 42-2 at 122 (Pls. Ex. 1)).

The second group of relevant provisions in Circle C's contract related to the company's duty to comply with federal payroll-certification requirements. The contract incorporated by reference the section of the FAR that required Circle C to maintain and submit payroll records for "all laborers and mechanics" on its project. These payroll records "shall contain the name, address, and social security number of each such worker, his or her correct classification, hourly rates of wages paid . . . , daily and weekly number of hours worked, deductions made, and actual wages paid." (Docket No. 42-2 at 106 (Pls. Ex. 1) (incorporating by reference 48 C.F.R. § 52.222-8(a)). That FAR provision also obligated Circle C to "submit weekly . . . a copy of all payrolls" that "set out accurately and completely all of the information required to be maintained under paragraph (a) of this clause." (*Id*. (incorporating by reference 48 C.F.R. § 52.222-8(b)(1)).

Moreover, the FAR section stated that "[t]he Prime Contractor is responsible for the submission of copies of payrolls by all subcontractors."  (*Id.*)

Circle C's contract also required each payroll submitted to "be accompanied by a 'Statement of Compliance,' signed by the Contractor or subcontractor" certifying:

> (i) That the payroll for the payroll period contains the information required to be maintained . . . and that such information is correct and complete;
> (ii) That each laborer or mechanic . . . has been paid the full weekly wages earned . . . ; and
> (iii) That each laborer or mechanic has been paid not less than the applicable wage rates and fringe benefits or cash equivalents for the classification of work performed, as specified in the applicable wage determination incorporated into the contract [*i.e.*, the Davis-Bacon Act rates].

(*Id.* (incorporating by reference 48 C.F.R. § 52.222-8(b)(2)).

The FAR section incorporated into Circle C's contract made clear that the "falsification of any of the certifications in this clause may subject the Contractor or subcontractor to civil or criminal prosecution under Section 1001 of Title 18 [which generally prohibits knowingly and willfully making false or fraudulent statements, or concealing information, in "any matter within the jurisdiction" of the federal government] and Section 3729 of Title 31 of the United States Code [the False Claims Act]."  (*Id.* (incorporating by reference 48 C.F.R. § 52.222-8(b)(4)).

Separate and apart from potential liability for falsification of the required certifications under the federal false-statements law and the FCA, the FAR sections incorporated into Circle C's contract also empowered the government to withhold from Circle C "accrued payments or advances . . . necessary to pay laborers and mechanics . . . employed by the Contractor or any subcontractor the full amount of wages required by the contract."  (*Id.* (incorporating by reference 48 C.F.R. § 52.222-7)).  And if withholding failed to cure the violations, the

government could also "suspen[d] . . . any further payment, advance, or guarantee of funds until such violations have ceased." (*Id*.).

Finally, Circle C's contract left no doubt that Circle C "shall be responsible for compliance by any subcontractor or lower tier subcontractor performing construction within the United States with all the contract clauses cited" above. (*Id*. (incorporating by reference 48 C.F.R. § 52.222-11(c)).

The Army paid Circle C $20,555,581.88 for 42 buildings (or delivery orders) under the contract. (Docket No. 305 at 8–13; Pls. Ex. 11). Of those, the government charged that Circle C submitted false payroll certifications for the buildings corresponding to delivery orders 6 through 12, 14, and 15. (*Id*.). Those buildings are located in Kentucky, except for delivery orders 8 and 12, which are in Tennessee. (*Id*.). The Army paid $3,005,309.70 for the seven Kentucky buildings and $762,089.71 for the two in Tennessee. (*Id*. at 13–14; Pls. Ex. 11).

In order to calculate damages, the Court must determine what the government paid Circle C for electrical work on the affected buildings. This would be a simple task if the contract broke out every component of electrical work on each building into a separate line item. But the contract is not structured in that way. Instead, it sets out a unit price for the basic construction of each pre-engineered building type—for example, a 5,250 square foot "Type A" facilities warehouse (cost: $173,500), a 5,250 square foot "Type B" vehicle-maintenance shop (cost: $256,500), a 3,500 square foot "Type C" vehicle-maintenance shop (cost: $239,000), or a 5,250 square foot "Type D" facilities warehouse with tall eaves (cost: $169,500). (Docket No. 42-1 at 5–6; Pls. Ex. 1). Critically, the pre-negotiated unit price for each building type includes basic amenities. So if the government ordered a "Type A" facilities warehouse, for example, it would

get a building with simple features like lights, outlets, carpet, floors, and finishings. (Docket No. 304 at 118).

The contract also allows the government to make à la carte modifications to each building. If the government wanted to add to that "Type A" facilities warehouse a tall chain-link fence or a loading dock, for example, the contract let the government do so and provided a preset price tag for each one. (Docket No. 42-1 at 11, 19; Pls. Ex. 1). Several of the à la carte modifications available to the government are related to electrical work, such as the installation of grounding poles or 220-volt receptacles. (*Id*. at 54, 56; Pls. Ex. 1).

Due to this pricing structure, calculating the precise amount the government paid Circle C on a given building for each specific construction component—whether roofing, plumbing, or, as relevant here, electrical work—is not possible. While the electrical à la carte modifications that Circle C delivered can be tracked, electrical work that was built into the price of each building type cannot be precisely disaggregated from the total cost of each building.

Recognizing this problem, Judge Haynes's previous damages determination did not depend on evidence of the amount the government actually paid Circle C for electrical work on the affected buildings. Instead, he relied on the Declaration of Jeanne Shykes, who estimated that electrical work accounted for 15% of the government's payments. (Docket No. 78 at 1); *see Wall II*, 697 F.3d at 358–59. Shykes based her judgment on the opinion of the late James W. Witty, a mechanical engineer at Fort Campbell who designed and wrote the specifications for the buildings at issue. (Docket No. 305 at 14–15; Docket No. 304 at 84–85). As Fort Campbell paid Circle C a total of $3,767,399.41 for the buildings affected by Circle C's fraud, Shykes determined that "approximately 15%—or $565,109.91—was for electrical work." (Docket No. 78 at 1). To that figure, Shykes applied the portion of electrical work that Phase Tech performed

12

on Circle C's projects—98%—to arrive at the bottom-line conclusion that Circle C's false payroll certifications affected $553,807.71 of Fort Campbell's funds. But Shykes did not elaborate any further on the 15% figure. She did not explain, for example, how Witty arrived at this figure or otherwise elucidate the source of his estimate. As a result, the Sixth Circuit decided that this evidentiary basis was "lacking in detail." *Wall II*, 697 F.3d at 359.

On remand, the government takes a new approach to estimating how much it paid Circle C for electrical work on the affected buildings. Rejecting the Shykes-Witty 15% figure, it relies instead on the expert testimony of William Doll. Doll has been a supervisor in the engineer design branch at Fort Campbell for the past five years and was a mechanical engineer technician on the base for five years before that. (Docket No. 304 at 81–83).

After examining the delivery-order records for the buildings at issue, Doll consulted RS Means, a data compendium of construction costs widely used in the industry to generate project estimates. (*Id*. at 87–88). RS Means is a reliable tool that Doll and his colleagues at Fort Campbell use every day. (*Id*. at 88). Doll testified that the estimates it provides are conservative, as the government generally pays 10–20% more than the RS Means median. (*Id*. at 93, 96). RS Means expresses the per-square-foot costs of construction component in a given type of building in dollar and percentage-of-total-cost terms, and provides the 25th, 50th, and 75th percentile for both figures. (Pls. Ex. 18). So, for example, RS Means shows that the median cost for electrical work in constructing a low-rise dormitory that has one to three floors is $7.65 per square foot or 9.1% of the total project cost, while the 75th percentile is $9.65 per square foot and 9.55% of the total project cost. (*Id*.).

For his estimates, Doll relied on the median percentage-of-total-cost figures for commercial service garages and combination warehouses and offices, the two building types

most analogous to the buildings Circle C erected for the government. (*Id*.). He found that for the service garages, electrical costs accounted for 9.4% of the total cost of construction; for the warehouses, it was 8% of the total. (*Id*.).

At trial, Doll summarized his opinion of the dollar value of the electrical work on each affected delivery order. (Docket No. 304 at 92–94; Pls. Ex. 14). First, Doll applied the relevant percentage figure from RS Means to the total the government paid Circle C for each basic building. Then, Doll added to that the amount Circle C received for any electric-related à la carte modifications the government ordered in each building. The sum of those figures represents in dollar terms the electrical portion of each affected delivery order. Doll then expressed each of those figures as a percentage of the total construction cost the government paid Circle C for each delivery order. The government entered into evidence a chart Doll created to summarize the electrical portion of the orders at issue:

| Delivery order | Electrical portion of delivery order | Electrical portion of delivery order as a percentage of the total construction cost of delivery order |
|---|---|---|
| 6 | $42,176.00 | 8.9% |
| 7 | $26,568.91 | 6.4% |
| 8 | $27,048.75 | 11.7% |
| 9 | $32,853.87 | 8.4% |
| 10 | $38,810.20 | 8.5% |
| 11 | $31,922.42 | 6.9% |
| 12 | $46,056.00 | 8.7% |
| 14 | $47,766.59 | 12.4% |
| 15 | $44,492.00 | 10.5% |

(Pls. Ex. 15; *see also* Pls. Ex. 13). To arrive at the total amount of Fort Campbell funds that Circle C's false payroll certifications affected, the government finally applied 98%—which is the

14

portion of electrical work Phase Tech performed on Circle C's projects—to the sum of the figures in the second column of the table above. This amounts to $330,940.83. (Pls. Ex. 13).

As a general matter, the Court credits Doll's testimony and the methodology he used to determine the amount of affected funds. Doll's methodology steeply discounts the government's claimed loss compared to the Shykes-Witty calculation. And rather than providing a single, unvaried estimate of the electrical portion of each building, as the government did before, Doll's analysis relies on a widely used cost estimator to back into a conservative, building-specific figure. Given the constraints of determining a precise figure due to the contract's pricing structure, the Court is satisfied that Doll's methodology accurately captures the amount of money the government paid Circle C for the electrical portion of each affected building.

The problem with the government's figure, however, is that it continues to include delivery orders 8 and 12, the two buildings in Tennessee. The Sixth Circuit has already determined that work on those buildings "should not have been included in the calculation of payments made to Phase Tech for work performed by the misclassified employees." *Wall II*, 697 F.3d at 359. Removing those two sums, which add up to $71,642.65, from the total affected funds yields $259,298.18. The Court finds that this is the amount the government paid Circle C for the electrical portion of the affected delivery orders at issue in this suit.

Jeanne Shykes testified at trial that she would have withheld all payments to Circle C had she known that the company filed payroll certifications that were false because they inaccurately stated that all workers earned Davis-Bacon Act wages when they did not, or because they omitted certain workers employed under the contract. (Docket No. 304 at 167–68). Shykes would have done this, she said, because a contractor who files false payroll certifications fails to meet the terms of its contract and thus is ineligible to receive the affected contract funds.

15

(Docket No. 305 at 32–33, 36–37).  And Shykes would have been within her rights to do so, at least until the violations ceased.[2]  *See* 48 C.F.R. § 52.222-7.  In this case, of course, withholding was not an available remedy because the government discovered the false certifications after paying Circle C for the delivery orders.  (Docket No. 304 at 164–65).

Circle C lodges two lines of factual attack on the government's calculation of how much it paid the company for the electrical portion of the affected delivery orders.  Neither is convincing.  First, Circle C insists that rather than straining to nail down an *estimate* of what the government paid Circle C for the electrical work Phase Tech did, the Court instead should simply look to Phase Tech's invoices and Circle C's records to determine what Circle C *actually paid* Phase Tech.  (Docket No. 313-1 at 20–23).  Those records indicate that Circle C's payments to Phase Tech totaled $86,931.73, excluding the Tennessee buildings.  *Wall II*, 697 F.3d at 359.

The trouble with Circle C's position is that the amount of its downstream payments to a subcontractor with whom the government has no contractual privity is irrelevant to what the government paid Circle C for electrical work as to which Circle C submitted false payroll certifications.  A hypothetical helps to show why.  Suppose that instead of having a contract that bundles electrical work with myriad other basic building costs, Circle C's agreement with the government let the company separately invoice the electrical work in each building.  And assume further that the government paid Circle C $100,000 for the labor and materials to do that work, and Circle C hired a subcontractor to do 90% of it.  If Circle C submitted false payroll certifications stemming from the subcontractor's work, and the government did not learn of that until after it paid Circle C in full, then the government's payments affected by those false certifications would be $90,000.  Whether Circle C paid its subcontractor $10,000 and made a

---

[2] Notably, the underpayment violations have not ceased.  Phase Tech's workers have not received the proper Davis-Bacon Act wages for their work on the Circle C contract.  (Docket No. 304 at 30, 61).

significant profit, or paid $100,000 and took a loss, the fact that Circle C's false certifications affected $90,000 in government funds remains unchanged.

Moreover, Circle C's payments to Phase Tech are not credible evidence of what the government paid Circle C, since the payments to Phase Tech reflect the lower (and unlawful) wage rates Phase Tech paid its employees by failing to pay Davis-Bacon Act wages. Those payments "obviously would have been higher if Circle C and its subcontractor had paid the proper . . . wages." *Id.* at 359. For this reason, Circle C's payments to Phase Tech are an unreliable proxy to determine the electrical portion of the affected delivery orders. Moreover, for the reasons outlined above, the payments to Phase Tech are not probative of the key question, which is how much the government paid Circle C for electrical work for which Circle C submitted false payroll certifications.

Circle C's second factual attack on the government's calculation is that Phase Tech did not do 98% of the electrical work on Circle C's contract at Fort Campbell. The Court finds that the most credible evidence in the record suggests otherwise.

The 98% figure is drawn from multiple sources, including the deposition testimony John Cates, Circle C's owner, Charles Cooper, Phase Tech's owner, and Wayne Cates, one of the original owners of Circle C and John Cates's son. (Docket No. 305 at 21–28). John Cates's June 2009 30(b)(6) deposition contained the following exchange:

Q:    And did Circle C use Phase Tech to do all the electrical work on this contract?

A:    Except for one job and was—

Q:    For one.

A:    —and that's the one that was either Story or Hendricks, I can't remember which one it was.

Q:    So about how much of the electrical work did Phase Tech do on this contract?

A:   Oh, gosh, it'd be 98 percent I guess.  Now at times we would have—we did have two guys that we would put as—as helpers, well they were getting paid as electrician[s] that would help Phase Tech, two of our people, they're still working for us but they weren't—they don't have license[s].

Q:   Who were those people?

A:   It was Tommy Parker and Steve Benton.

Q:   But about 98 percent of the electrical work on this government requirements—

A:   Yes.

Q:   —contract was done by—

A:   It was.

Q:   Phase Tech.

(Pls. Ex. 26 at 33–35).  Later in the same deposition, when John Cates was asked if he said "earlier that they [Phase Tech] were doing 98 percent of your electrical work," he responded, "Phase Tech did, yes."  (Docket No 75-5 at 62).  In the same vein, Charles Cooper had the following exchange during his deposition on July 2, 2009:

Q:   And how many buildings did y'all do electricity for?

A:   The whole contract, I think, was 41.

Q:   And y'all worked on—y'all did the electrical work on all those 41 buildings?

A:   Yes.

(Docket No. 75-8 at 9).  Finally, Wayne Cates said in his June 2009 deposition that he thought that Phase Tech "[p]robably" did all of the electrical work on the Fort Campbell contract.  (Docket No. 75-2 at 11).

At trial, however, John Cates sought to walk back from his earlier statements that Phase Tech did 98% of the electrical work on the buildings, offering three "clarifications" of his prior testimony.  Each one is either illogical, not credible, or both.

18

Cates explained first that he meant in his deposition that Phase Tech did 98% of the electrical work on all 42 buildings under Circle C's Fort Campbell contract, not on the specific buildings at issue in this case. (Docket No. 306 at 123–24). Whether or not that's true, the record contains no indication that Phase Tech did any less work (or any more) on the particular buildings affected by Circle C's fraud than it did on the other buildings under the contract. So even if Cates meant the 98% figure to apply to the whole contract, no evidence—apart from Cates's self-serving, late-in-the-day explanation of what he really meant in 2009—suggests that Phase Tech performed less than 98% of the electrical work on the buildings at issue.

Cates next offered that he meant that Phase Tech did 98% of the labor work on the electrical portion of Circle C's contract, but that it did not provide materials or equipment. (Docket No. 306 at 124–25). Cooper, Cates's one-time employee and long-time business associate, backed up his former boss's contention that Circle C provided Phase Tech with materials and equipment. (Docket No. 306 at 9–10, 124–25). The upshot, according to Circle C, is that the government's estimate, which includes labor, materials, and equipment, (Docket No. 304 at 97), is inflated.

Cates's and Cooper's testimony on this point is not credible. Again, it comes too late in the game. Never during the summary-judgment stage did Circle C make this claim. That is odd, given that the claim is based entirely on knowledge that has been within Circle C's possession since before this lawsuit was filed; yet Circle C first surfaced this argument post-remand. And at trial, Circle C offered no explanation for its recently refreshed recollection. Moreover, Cates's and Cooper's demeanors on the stand convince the Court that this evidence is not credible.

Apart from what Cates and Cooper testified to at trial, Circle C offers scant evidence to support its newfound interpretation of what Cates and Cooper said in 2009. At an earlier point in

19

the litigation, Cates submitted a sworn affidavit stating that Phase Tech paid for approximately one percent of the electrical materials used in the buildings it worked on.[3] (Docket No. 264-1 at 2). Given Circle C's contention that Phase Tech billed it $2,615.52 for materials, (Docket No. 313 at 10; Docket No. 305 at 201–05), that suggests that Circle C's materials costs on the contract exceeded $260,000. Yet there is no evidence of that in the record. All that the Court knows is that Phase Tech billed Circle C for material costs on some of the buildings. But without some measure of the total material costs, the Court is left to guess whether Phase Tech's billings for materials are a substantial or insubstantial portion of the total.

The agreement between Circle C and Phase Tech might be another means to confirm Circle C's contention that Phase Tech provided only labor, but that too does not support the limitation Circle C now tries to place on the work Phase Tech did. In his 2009 deposition, Cates stated that Circle C had no written agreement with Phase Tech, but that the verbal agreement they had required Phase Tech "to do all of the electric work." (Pls. Ex. 26 at 38). At trial, however—roughly five years later—Cates testified that he had found "a yellow piece of paper" that had written on it three types of buildings and how much Circle C would pay Phase Tech to do the work on each. (Docket No. 306 at 129, 139). The contract gives no hint that Phase Tech was to provide labor alone. (*Id*. at 143; Pls. Ex. 20 at 12). According to Cates, the agreement represented only that "Phase Tech g[a]ve [Circle C] a set price for the whole building" and "Circle C pa[id] Phase Tech based on that set price." (*Id*. at 129–30). One searches in vain for a mention in the agreement (or, for that matter, the record) that "a set price for the whole building" includes just labor costs, and not materials or equipment.

---

[3] The Court realizes that Circle C filed this affidavit in support of a late-filed summary-judgment motion that the Court struck. (Docket No. 265). That basis for striking the motion, however, does not change the substance of Circle C's assertions in it, including Cates's sworn affidavit.

Equally unilluminating are Phase Tech's invoices to Circle C. (Def. Ex. 16). First, as already noted, several of them explicitly include Phase Tech's billings for material costs. More to the point, the line items in the invoices are generally too vague to be of any help to Circle C in establishing that Phase Tech did only labor work. The invoice for delivery order 10 is a good example. It reads, in full:

> First Invoice for Job #714710 Steel building at 52nd St and Wickham.
>
> Finish Electrical work and Fire Alarm.
> Final Billing 2-23-2005
> Total this job $13,900.00
> Billed to date $13,900.00
>
> Additional for Overtime $900.00

(*Id*.). At bottom, the competent evidence in the record does not support Circle C's narrowing construction of Cates's 2009 deposition testimony. As well, Cates's and Cooper's testimony on this point was not credible. The Court therefore finds that Circle C's second factual attack on the 98% figure fails.

Just so with Circle C's final and related attempt to disavow Cates's 2009 admission. Circle C posits that Phase Tech only did the electrical work inside the buildings, but did not do the outside "site" work. (Docket No. 306 at 11, 125–26). Circle C divides its time on this point between two arguments. The first is that the government did not establish that Phase Tech performed the outside work. The second is that another company, B&R Electric, was the entity actually responsible for it.

Circle C's whole argument with respect to the inside-outside distinction is too little, too late. First, Circle C never argued that Phase Tech's work on the affected buildings was limited

in this way until after the Sixth Circuit remanded the case for a recalculation of damages. Putting aside the suspicion this timing raises, it is clear that the Sixth Circuit's limited remand does not encompass this issue (which, again, Circle C did not raise at the summary-judgment stage or on appeal). In fact, Circle C appears to have first floated the notion that Phase Tech did not do outside electrical work when it deposed William Doll in July 2013—one week before the first trial on damages. (Docket Nos. 204 at 2; 211 at 5).

Moreover, with respect to B&R Electric, Circle C's story appears to be disingenuous. According to Cates, B&R was not technically Circle C's subcontractor because the government chose B&R to do outside work and had a contract with B&R directly. (Docket No. 306 at 127–28). Circle C functioned as a conduit or pass-through for B&R and the government: B&R would send invoices to Circle C, Circle C would ask the government for payment for B&R's work, and Circle C would then pay B&R. (*Id*. at 128–29). "[E]very time the site work was done on the 42 buildings" and B&R sent an invoice to Circle C, Cates testified, "I signed the check for B&R []." (Docket No. 307 at 18).

Circle C's post-remand revelations that B&R did outside work on the buildings might be more convincing if Circle C had produced at least one of the checks or invoices that Cates described. But Circle C did not do so. (The reason, Cates explained, is that he "was never asked to." (*Id*. at 20).) On the other side of this factual dispute, William Doll testified that he personally knew that the Army did not have a contract with B&R at Fort Campbell for exterior electrical work during the relevant time period. (Docket No. 307 at 6–7). As between Doll's credible testimony and the unsupported, self-serving, and belated story Cates told, the Court credits Doll's account. Like the previous argument that Phase Tech only did labor work, the Court concludes Circle C's testimony on this point is not credible. More broadly, the Court

confirms that Phase Tech, and not another entity, did 98% of all of the electrical work on the buildings at issue.

With those core facts established, the Court moves on to apply to them the law relevant to determining Plaintiffs' damages.

### CONCLUSIONS OF LAW

The FCA subjects violators to a civil penalty of between $5,000 and $10,000, plus three times the government's actual damages. 31 U.S.C. § 3729(a). "Damages awarded under the False Claims Act typically are liberally calculated to ensure that they 'afford the government complete indemnity for the injuries done it.'" *United States ex rel. Compton v. Midwest Specialties, Inc*., 142 F.3d 296, 304 (6th Cir. 1998) (quoting *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 549 (1943)). The Sixth Circuit has already held in this case that the government may recover as actual damages "the difference between what it paid and what it should have paid for the goods." *Wall II*, 697 F.3d at 358 (internal quotation marks omitted). Under the statute, the government must prove its actual damages by a preponderance of the evidence. 31 U.S.C § 3731(d).

Broadly speaking, "parties that contract with the government are held to the letter of the contract—irrespective of whether the contract terms appear onerous from an *ex post* perspective, or whether the contract's purpose could be effectuated in some other way—under the maxim that 'men must turn square corners when they deal with the Government.'" *Compton*, 142 F.3d at 302 (quoting *Rock Island, Ark. & La. R.R. Co. v. United States*, 254 U.S. 141, 143 (1920) (Holmes, J.)) (alteration omitted). As the Sixth Circuit has observed, "'[t]he mere fact that [an] item supplied under contract is as good as the one contracted for does not relieve defendants of liability' [under the FCA] if the item does not in fact conform to the express contract terms." *Id*.

at 302 n.4 (quoting *United States v. Aerodex, Inc.*, 469 F.2d 1003, 1007 (5th Cir.1972) (first

alteration in original). "[R]ecovery under the FCA is not dependent upon the government's

sustaining monetary damages." *Varljen v. Cleveland Gear Co., Inc.*, 250 F.3d 426, 429 (6th Cir.

2001).

Here, few doubts cloud the conclusion that Circle C's noncompliance with the Davis-

Bacon Act injured the government's interests, including its fiscal resources. *Wall II* made crystal

clear that compliance with the Davis-Bacon Act's certification requirement is a precondition of

government payment. 697 F.3d at 355 ("The payment of federal funds is contingent upon the

receipt of the contractors' weekly certifications.") (citing 40 U.S.C. § 3142). Contractors who

fail to comply with that requirement undermine the Act's purposes, which are "'to give local

laborers and contractors fair opportunity to participate in building programs when federal money

is involved and to protect local wage standards by preventing contractors from basing their bids

on wages lower than those in the prevailing area.'" *Id.* at 354–55 (quoting *L.P. Cavett Co. v.

U.S. Dep't of Labor*, 101 F.3d 1111, 1113 (6th Cir. 1996)). In short, contractors like Circle C

who knowingly make false certifications of their compliance with the Davis-Bacon Act that are

material to the government's payment decision subvert Congress's policy goals.

The government's most obvious injury, however, is that it pays more for construction

work to further the Act's labor-market-support goals than it would if it contracts were awarded to

the lowest-cost bidder. (Docket Nos. 225 at 13–15; 304 at 155–56). In this case, Circle C

pocketed the some part of the premium the government paid to further those goals. *Wall II*, 697

F.3d at 359. Moreover, Circle C forced the government to shoulder the increased costs of

enforcing the statute. Notwithstanding Circle C's claim that its fraud did no harm to the

government—but, to the contrary, enriched the government, which paid less for the buildings

24

than it otherwise would have, (Docket No. 317 at 2–3)—Circle C's conduct injured the federal fisc and the furtherance of Congress's policy objectives.

To arrive at the government's damages, the Court must determine the difference between what the government paid Circle C and what it should have paid given the company's fraudulent conduct. *See Wall II*, 697 F.3d at 358. The first part of that calculation is relatively simple. As noted above, the Court credits the testimony of Shykes and Doll concerning what the government paid for the electrical portions of the affected buildings Circle C built. The Court, however, will not include in that sum the government's outlays for electrical work on the two buildings in Tennessee. *See id.* at 359. The total amount the government paid Circle C for electrical work attributable to Phase Tech on the remaining Kentucky buildings is $259,298.18.

As for the second part of the calculation, the parties vehemently disagree over the proper measure of the payments Circle C would have been entitled to given its fraud. The government says the number is zero because, had it known that Circle C would not comply with the Davis-Bacon Act on a portion of the contract, it would not have paid Circle C for that portion. (Docket No. 312 at 7). Circle C rejoins that its liability is zero because false certifications and underpayment of workers do not diminish the value of the buildings the government purchased. (Docket No. 313-1 at 2–3). Alternatively, Circle C claims that if it is liable, it is either for the underpayments to Phase Tech's workers or for the amount Circle C paid to Phase Tech for work on the affected buildings. (*Id.* at 14–15, 20).

The government position is more persuasive. Although no binding authority controls this dispute, cases from the Sixth Circuit and outside of it point the way forward. Three precedents are particularly relevant. First, in *Compton*, the Army contracted for brake-shoe kits that were supposed to withstand 5,000 pounds of force and be subjected to rigorous quality-assurance

25

testing. 142 F.3d at 297–98. The contractor delivered kits that did not meet either requirement. *Id*. The district court computed the contractor's liability as three times the full contract price, which the Sixth Circuit affirmed. *Id*. at 304–05. That result, *Compton* said, is consistent "with the general rule recognized in the Uniform Commercial Code that a buyer may reject goods outright 'if the goods or the tender of delivery fail in *any* respect to conform to the contract.'" *Id*. at 305 (quoting U.C.C. § 2-601) (emphasis added). Moreover, in rejecting the contractor's claim that the value of the goods as delivered should be deducted from the value of the goods as promised, the court leaned on a different, policy-based rationale:

> [W]e agree with the government that Midwest's argument in favor of a setoff based on value purportedly received would create a perverse incentive system in which government contractors could endanger the lives of American soldiers by providing substandard materiel, and the Army would be deterred from correcting the danger because it would be forced to bear the cost of any use it received from the substandard goods before their defects were discovered. We stress that the government did not bargain only for plug-welded brake shoes that could withstand a certain amount of force; they also bargained for the confidence that comes with a product that has been subjected to production testing.

*Id*. at 305 n.8. *Compton* involved items the government purchased that were useless, and that is not the case here. But its policy-driven refusal to offset the government's damages just because the government got some use out of a product is instructive. This deterrence rationale bears directly on this case.

Next, in *United States v. Rogan*, the defendant concealed that many patients came to his medical facility because of compensated referrals that violated federal law. 517 F.3d 449, 451–52 (7th Cir. 2008). The government claimed that he defrauded the United States when he billed Medicare and Medicaid for the care they received, and brought an FCA action seeking to recover all payments that Medicare and Medicaid made to the defendant. *Id*. The defendant argued that the government sustained no damages because "most of the patients for which claims were

submitted received some medical care—perhaps all the care reflected in the claim forms." *Id*. at

453. Concluding that the defendant was liable for the full amount the United States paid his

medical facility, Judge Easterbrook explained:

> The government offers a subsidy . . . with conditions. When the conditions are
> not satisfied, nothing is due. Thus the entire amount that [the medical center]
> received on these 1,812 claims must be paid back. Now it may be that, if the
> patients had gone elsewhere, the United States would have paid for their care. Or
> perhaps the patients, or a private insurer, would have paid for care at [the medical
> center] had it refrained from billing the United States. But neither possibility
> allows [the defendant] to keep money obtained from the Treasury by false
> pretenses, or avoid the penalty for deceit.

*Id*. *Rogan* illustrates that when the government conditions payment on certain requirements, its

damages may amount to all payments tainted by a contractor's failure to comply with those

requirements, with no reduction for the value the government received.

Finally, *United States ex rel. Liotine v. CDW Government, Inc.* involved a vendor

accused of selling products to the United States that did not comply with the Trade Agreements

Act of 1979 (TAA). 2012 WL 2807040, at *9 (S.D. Ill. July 10, 2012). That statute generally

prohibits the sale of goods from non-designated countries. Like Circle C does here, the

defendant argued that "because relator cannot show diminished value in any good from a non-

designated country that was sold and kept for use by the government, he cannot demonstrate that

any item is worth less than what the government paid, and as such, there are no damages for

relator's claim." *Id*. at *10 (brackets and internal quotation marks omitted). The relator,

however, responded that "damages can be shown if the government would not have paid the

claims 'but for' the false claims submitted—here, false claims that [the defendant's] products

complied with the TAA." *Id*. For its part, the United States filed a statement of interest as to the

proper damages measure. It contended that, under Seventh Circuit law, "when a contractor

violates a core pre-condition for payment like the TAA that relates directly to the contractor's

eligibility to supply a particular good or service, nothing is due to the contractor, regardless of whether goods or services were provided." *Id*. Thus "the resulting measure of damages to the United States is the full value of any amount paid out by the government." *Id*.

Weighing the competing claims, *Liotine* held that because compliance with the TAA was a precondition for the defendant's sales to the government, the correct measure of damages stemming from the defendant's knowing sales of TAA-barred products is the entire amount that the government paid for the products. *Id*. at *11. Otherwise, *Liotine* reasoned,

> the United States may not sustain any damages for knowing violations of the TAA other than the civil penalty [under the FCA]. Indeed, the fact that the goods are purchased from a non-compliant country does not in itself mean that the goods are of any less quality or value, but that is not the interest that the TAA is designed to protect . . . . [The TAA's] purposes cannot be accomplished if a party who has come to an agreement with the United States to abide by the TAA and only sell from compliant countries is allowed to knowingly sell from non-compliant countries.

*Id*. Given the circumstances, *Liotine* concluded that the defendant "is not entitled to keep money obtained from the government under false pretenses." *Id*.

The same rationale applies here. Because compliance with the Davis-Bacon Act was a precondition of government payment, the correct measure of damages is the entire amount the government paid for the electrical portion of the work on the affected buildings. Circle C's position—that the government got exactly what it asked for as long the electrical systems work—misses a crucial element of what the government bargained for. The Davis-Bacon Act's purposes would be thwarted if a party could strike a deal with the government to abide by the Act's terms and then knowingly refuse to do so.

Circle C's position ignores credible evidence that the government would not have paid Circle C for this work if it had known at the time that Circle C was violating the Davis-Bacon

Act.  (Docket No. 305 at 28–33; *see also* Docket No. 225 17–19).  And it overlooks Cates's own admission that he well understood that the government does not pay contractors who submit false payrolls.  (Docket No. 306 at 145).  The government has amply shown that if it had known of Circle C's fraud, it would not have paid for the work that fraud tainted.

Notably, the government's damages leave untouched the vast majority of payments Circle C received for the tainted buildings in Kentucky, which totals $3,005,309.70.  (Docket No. 305 at 13; Pls. Ex. 11).  In other words, the government's damages amount to 8.6% of what it paid out to Circle C to construct the buildings.  To Circle C's argument that even this amount is inequitable, to the contrary "[t]he damages provision in the FCA reflects Congress's view 'that some liability beyond the amount of the fraud is usually necessary to compensate the Government completely for the costs, delays and inconveniences occasioned by fraudulent claims.'"  *United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Grp., Inc.*, 400 F.3d 428, 456 (6th Cir. 2005) (quoting *Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 130 (2003)).  On top of that, "the treble damages provision ensures not only full compensation, but also the fundamental integrity of all those who seek to do business with the Government."  *Id.*

That leaves only Circle C's two alternative damages measures for the Court to consider. The first is that Circle C is liable only for the underpayments to Phase Tech's workers.  (Docket No. 313-1 at 14–15).  Circle C's grounds its position in the Davis-Bacon Act's administrative regulations that limit the amount the government can withhold to worker underpayments. Effectively, Circle C says, if the government had enforced the regulations, the company would have resolved the underpayment dispute.  But because the government did not try, the most it can get now is the amount the workers were underpaid.  This is incorrect.

As a factual matter, Circle C's argument ignores that withholding was impossible at the time of the fraud because the government did not know about it. Circle C's argument also tangles up the strands of two independent remedial schemes. "The injuries *and remedies* under the FCA and Davis-Bacon Act are separate and distinct." *Wall II*, 697 F.3d at 352 (emphasis added). And whatever the scope of ills the Davis-Bacon Act may properly cure, the FCA "is the exclusive remedy provided by Congress to recover for fraudulent claims made against the Government." *Medshares*, 400 F.3d at 456. Moreover, the Davis-Bacon Act's administrative regulations expressly contemplate that FCA liability may attach if a contractor falsifies any certifications the regulations require, including the payroll certifications at issue here. *See* 48 C.F.R. § 52.222-8(b)(4). Congress wrote the FCA "'expansively, meaning to reach all types of fraud, without qualification, that might result in financial loss to the Government.'" *Id.* (quoting *Chandler*, 538 U.S. at 129). Circle C insists that the broad scope of the FCA's remedial provisions somehow carves out compliance with the Davis-Bacon Act. The Court rejects this position.

Circle C's second alternative damages theory is that it is only liable for the amount it paid to Phase Tech for work on the affected buildings. (Docket No. 313-1 at 20). The Court has already rejected this argument. What Circle C paid a subcontractor with whom the government has no privity is irrelevant to pinning down what the government would not have paid Circle C if the government had known that fraud tainted a part of its contract. This, too, fails.

In summary: The total amount the government paid Circle C for electrical work that Phase Tech did on the affected delivery orders in Kentucky is $259,298.18. Because compliance with the Davis-Bacon Act was a precondition of government payment, the correct measure of damages is the entire amount the government paid for that work. The government has proven

that it would not have paid for that work had it known the truth.  As Circle C was entitled to zero

dollars for the electrical work Phase Tech did in the buildings at issue, the government's actual

damages resulting from the payment of tainted claims to Circle C are $259,298.18.

Violators of the FCA are subject to three times the government's actual damages.  *See* 31

U.S.C. 3729(a); *Wall II*, 697 F.3d at 358.  The government's treble damages thus equal

$777,894.54.  That figure must be offset, however, by Phase Tech's $15,000 settlement payment.

*See United States v. Bornstein*, 423 U.S. 303, 314 (1976) (in construing a prior version of the

FCA that required double damages, holding that the government's actual damages should be

doubled before any compensatory payments are deducted); *see also United States v. Ekelman &

Assoc., Inc.*, 532 F.2d 545, 550 (6th Cir. 1976) (same).  The Court therefore will award the

government $762,894.54.

## CONCLUSION

For the foregoing reasons, the Court will award Plaintiffs $762,894.54 in damages.  An

appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE